In the Matter of George R. JOYNER
and Sarah M. Joyner, Debtors,

Joyner Oil Company, Inc., Debtor,

J–Mart Super Foods, Inc., Debtor.

AMOCO OIL COMPANY, A Maryland
Corporation, Movant,

v.

Sarah M. JOYNER, George R. Joyner and
Joyner Oil Company, Inc., and J–Mart
Super Foods, Inc., Respondents.

Bankruptcy Nos. 84–50362–Mac,
84–50398–Mac and
84–50399–Mac.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Feb. 1, 1985.

Robert E. Bergman, Warner Robins, Ga., for debtors.

O. Hale Almand, Jr., and Robert O. House, Sell & Melton, Macon, Ga., for Amoco Oil Co.

## MEMORANDUM OPINION ON MOTION SEEKING RELIEF FROM THE AUTOMATIC STAY, FOR ADEQUATE PROTECTION, FOR ABANDONMENT AND FOR DISMISSAL OF CASES

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

### STATEMENT OF THE CASE

On April 11, 1984, George R. Joyner and Sarah M. Joyner filed a petition under Chapter 11 of the United States Bankruptcy Code. On April 25, 1984, Joyner Oil Co., Inc. and J–Mart Super Foods, Inc. filed separate Chapter 11 petitions. On September 6, 1984, these three Chapter 11 cases were substantively consolidated by the Court. (George R. Joyner and Sarah M. Joyner, J–Mart Super Foods, Inc., and Joyner Oil Co., Inc. are referred to hereinafter as "Debtors").

On November 29, 1984, Amoco Oil Company, a Maryland Corporation, (hereinafter "Amoco") filed a "Motion Seeking Relief from the Automatic Stay, for Adequate Protection, for Abandonment and for Dismissal of Cases." The motion asserts that Joyner Oil Company and Amoco entered into a franchise contract under which Joyner Oil Company agreed to sell Amoco gasoline and diesel fuel, and that Amoco and Joyner Oil Company entered into a tires, batteries, and accessories contract under which Joyner Oil Company was to buy and sell other Amoco products. The motion further asserts that Joyner Oil Company is in violation of the contracts because of commingling non-Amoco fuels with Amoco fuels. Amoco asserts that Joyner Oil Company distributed non-Amoco gasoline and diesel fuel through Amoco brand fuel pumps. The motion asserts that the commingling and the distribution through Amoco fuel pumps are grounds for termination of Joyner Oil Company's contracts under the Petroleum Marketing Practices Act.[1] Amoco has notified Joyner Oil Company of its intent to terminate the contracts,[2] and it seeks relief from the automatic stay to terminate the contracts. Amoco asserts that no adequate protection can be offered by Joyner Oil Company since the commingling is a noncurable breach of the contracts.

Amoco also seeks relief from the automatic stay, contending there is no reasonable prospect for debtors' reorganization and that Joyner Oil Company has no equity in Amoco trade names and lettering. Finally, Amoco contends that the Chapter 11 cases should be dismissed.

On December 21, 1984, Debtors filed a motion to deny the relief requested by Amoco. The motion admits the commingling, but asserts that the commingling was caused by the improper acts of Amoco in withholding funds owed to Joyner Oil Company.

Amoco's motion came on for a hearing on January 9, 1985. At the conclusion of the hearing, the Court requested briefs from counsel in lieu of closing arguments. On January 21, 1985, the Court, with the consent of Debtors, entered an order enjoining Joyner Oil Company from any further commingling.

The Court, having considered the evidence presented at the hearing, the briefs

---

**1.** 15 U.S.C.A. §§ 2801–2841 (West 1982).

**2.** 15 U.S.C.A. §§ 2802, 2804 (West 1982).

of counsel, and the applicable law, now publishes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In the summer of 1982, Joyner Oil Company purchased its assets from Mr. Charles Hickman. Mr. Joyner was approved, pursuant to Amoco regulations, by Amoco to assume the wholesale distribution of Amoco products, and on January 25, 1983, Joyner Oil Company entered into Amoco "Jobber Contract # 9825."[3] Under the contract, Joyner Oil Company agreed to purchase products from Amoco, to maintain at least one bulk plant for the storage of products purchased from Amoco, and to market and deliver Amoco products to Amoco service stations in a specified area. The term of the contract is from April 12, 1983, to April 30, 1986.

Paragraph seven of the contract provides:

[Joyner Oil Company] shall not use [Amoco Marks] in connection with the advertising, distribution, or sale of: (1) any mixture, blend, dilution or adulteration of a product supplied by [Amoco]; (2) products not sold in [Amoco's] original packages and containers or not sold in packages, containers, or through equipment approved by [Amoco]; or (3) any product not supplied by [Amoco]. . . .

The contract provides that each party reserves all rights under the Petroleum Marketing Practices Act.

In addition to the jobbership, Joyner Oil Company operated six Amoco gasoline stations purchased from Mr. Hickman.

In the ordinary course of business, Joyner Oil Company purchased its gasoline and diesel fuel from The Marathon Oil terminal in Macon, Georgia. A special Amoco fuel additive was added to the fuel once it was purchased. Joyner Oil Company then stored the fuel at its bulk plant and distributed it to the Joyner Oil Company service stations and other Amoco service stations within the specified area.

In June of 1984, which was after Joyner Oil Company filed its Chapter 11 case, Joyner Oil Company started to purchase non-Amoco fuel and dispense it through Amoco fuel pumps. This commingling continued until December 10, 1984. Mr. Joyner admits that fifty to sixty percent of the fuel that Joyner Oil Company purchased between June of 1984 and December 10, 1984, was non-Amoco fuel. He testified that a large portion of this fifty to sixty percent was distributed to customers through Amoco pumps. Some consumers paid for the non-Amoco fuel with Amoco credit cards.

In August of 1984, Amoco sent Mr. Earl D. Todd, an Amoco security representative, to investigate Joyner Oil Company. On August 23, 1984, Mr. Todd observed a Joyner Oil Company truck obtaining fuel from the Union 76 terminal and distributing the fuel to an Amoco service station. As a result of Mr. Todd's investigation, Amoco notified Joyner Oil Company by letter dated October 19, 1984, that its contracts with Joyner Oil Company were terminated because Joyner Oil Company had violated the contracts. The termination was to be effective January 20, 1985.

Mr. Joyner testified that Joyner Oil Company has begun to implement plans to decrease business costs and to effectuate a reorganization of its business.

## CONCLUSIONS OF LAW

Amoco's motion for relief from the automatic stay is based on 11 U.S.C.A. § 362(d) (West 1979), which provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

---

3. The wholesale distribution of Amoco products to service stations is called a jobbership.

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Amoco first contends that the automatic stay should be terminated "for cause" because Joyner Oil Company's commingling of fuel provides grounds for termination of the contracts. Amoco asserts that the commingling resulted in an incurable default under the contracts, and that Amoco's interests are thus not adequately protected. Amoco requests relief from the automatic stay in order for it to terminate the relationship between itself and Joyner Oil Company.

 The termination of a retail oil franchise or jobbership franchise by an oil company franchisor[4] is governed by the Petroleum Marketing Practices Act, 15 U.S.C.A. §§ 2801–2841 (West 1982). *Halder v. Standard Oil Co.*, 642 F.2d 107 (5th Cir. April 6, 1981) (Unit B); *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984). The Act is intended to provide franchisees "meaningful protections from arbitrary or discriminatory terminations and non-renewals," and, at the same time, it seeks to protect "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including failures to comply with contractual obligations."[5]

Section 102 of the Petroleum Marketing Practices Act provides, in pertinent part:

### General prohibition against termination or nonrenewal

(a) Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—

(1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

### Precondition and grounds for termination or nonrenewal

(b)(1) Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragrpah (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

---

**4.** Franchisor means "a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale ... of motor fuel." 15 U.S.C.A. § 2801(3) (West 1982). Franchisee means "a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale ... of motor fuel." 15 U.S.C.A. § 2801(4) (West 1982).

**5.** S.Rep. No. 731, 95th Cong., 2d Sess. 18–19, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 877.

. . . .

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

. . . .

*Definition*

(c) As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as—

. . . .

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

15 U.S.C.A. § 2802 (West 1982).

■ In this case, Joyner Oil Company's contracts with Amoco provided that Joyner Oil Company was not allowed to distribute non-Amoco fuel under the Amoco trademark. Mr. Joyner freely admits that he distributed non-Amoco fuel through Amoco fuel pumps during the period from June 1984 to December 10, 1984.[6] Thus, Amoco would generally be entitled to terminate the franchise with Joyner Oil Company because of Joyner Oil Company's commingling.[7] *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984); *Haynes v. Exxon Co., U.S.A.*, 512 F.Supp. 543 (E.D.Tenn.1981); *Stewart v. Shell Oil Co.*, 518 F.Supp. 6 (D.Nev.1980).

■ Furthermore, the commingling of fuel is regarded as a noncurable breach of the franchise relationship, and the franchisor is not required to give the franchisee a second chance prior to termination. In *Wisser Co., Inc. v. Mobile Oil Corp.*, 730 F.2d 54 (2d Cir.1984), the Court held:

It is clear from the structure of the statute that Congress meant to give franchisees the right to cure for some kinds of conduct or conditions that if continued would warrant termination or nonrenewal, but did not intend to require a second chance for other kinds of conduct or conditions. See S.Rep. No. 731, 95th Cong., 2d Sess. 33–38 (1978), reprinted in 1978 U.S.Code Cong. & Ad. News 873, 891–97. While the legislative history does contemplate "[f]lexibility . . . so that a franchisor may work with a franchisee in an effort to correct the situation and avoid termination . . . or nonrenewal," id. at 33–34, 1978 U.S.Code Cong. & Ad.News at 892, it also recognizes that "[s]ome contractual violations, although not readily reducible to a dollar value, may be so serious as to undermine the entire relationship," id. at 18, 1978 U.S.Code Cong. & Ad.News at 876.

The misbranding alleged in this case falls into the latter category. . . . [W]e hold that terminations pursuant to 15

---

**6.** Amoco contends that Joyner Oil Company commingled fuel even before the bankruptcy filing. The only evidence that supports this contention is a letter from Amoco to Joyner Oil Company dated March 30, 1984. This letter states that Joyner Oil Company purchased 129,-544 gallons of regular gasoline from Amoco in January 1983 and 153,254 gallons of regular gasoline in February 1983. In comparison, the letter states that Joyner Oil Company purchased only 72,108 gallons of regular gasoline in January 1984 and 61,049 gallons in February of 1984. This evidence is insufficient for the Court to find that Joyner Oil Company was commingling fuel during this time.

**7.** Because of the Court's decision, it need not decide whether Joyner Oil Company's commingling was justified because of Amoco's withholding of funds owed to Joyner Oil Company.

U.S.C. §§ 2802(b)(2)(A) and 2802(b)(2)(C) do not require notice and opportunity to cure before notice of termination may be given.

*Id.* at 59. *See also Di Napoli v. Exxon Corp.,* 549 F.Supp. 449 (D.N.J.1982); *Pugh v. Mobile Oil Corp.,* 533 F.Supp. 169 (S.D. Tex.1982).[8]

■ To terminate a franchise, the franchisor must strictly comply with the notice requirements of the Petroleum Marketing Practices Act. *Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.1984); *Escobar v. Mobil Oil Corp.,* 678 F.2d 398 (2d Cir.1982); *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380 (10th Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982).

15 U.S.C.A. § 2802(b)(2)(A), (C) sets forth the requirements for Amoco to terminate Joyner Oil Company's franchise. Those subsections provide that a franchise may be terminated only if the franchisor first acquired actual or constructive knowledge of grounds for termination:

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

15 U.S.C.A. § 2802(b)(2)(A)(i), (ii) (West 1982); 15 U.S.C.A. § 2802(b)(2)(C)(i), (ii) (West 1982). 15 U.S.C.A. § 2804(a) (West 1982) states that a franchisor generally shall give the notice of termination 90 days prior to the effective date of the termination. 15 U.S.C.A. § 2804(b)(1) (West 1982) provides for less than 90 days' notice under certain circumstances.

■ In this case, Amoco first became aware of the commingling on August 23, 1984, the day Mr. Todd observed the delivery of non-Amoco fuel to an Amoco service station. Amoco's notice of termination was given on October 19, 1984, and stated that the termination was to be effective on January 20, 1985. Amoco thus appears to have complied with the time requirements of the Petroleum Marketing Practices Act. However, for the reasons hereinafter stated, the Court holds that the notice was null and void, and therefore Amoco may not terminate the franchise relationship with Joyner Oil Company.

The automatic stay of the Bankruptcy Code, 11 U.S.C.A. § 362(a) (West 1979) provides, in part:

Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—

. . . .

(3) any act to obtain possession of property of the estate or of property from the estate;

Property of the bankruptcy estate is defined in 11 U.S.C.A. § 541 (West 1979), and the definition includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Several courts have held that a debtor's oil franchise is property of the bankruptcy estate, and that a notice of termination or nonrenewal under the Petroleum Marketing Practices Act is an act designed to obtain possession of property of the bankruptcy estate and that, as such, the sending of the notice is barred under section 362. *In re Hadley,* No. 81–3300, (S.D.Ill. Dec. 10, 1984); *Rogue Valley Stations, Inc. v. Birk Oil Company, Inc.,* 568 F.Supp. 337 (D.Or.1983); *In re Harrell Oil Co.,* 38 B.R. 280, 11 Bankr.Ct.Dec. 882 (Bankr.E.D. N.C.1984).

Since the notice in this case was sent in violation of the automatic stay, it is void and without effect. *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir.1984); *Borg-Warner Acceptance Corp. v. Hall,* 685 F.2d 1306 (11th Cir.1982).

The Court notes the article by Casher & Trachtenberg, *Caveat Franchisor: The Interplay of the Bankruptcy Code and the*

---

**8.** The Court also notes that under O.C.G.A. § 10–1–163 (Michie 1982), the substitution or misbranding of fuel is punishable as a misdemeanor.

*Petroleum Marketing Practices Act,* 87 Com.L.J. 216 (1982), in which the authors state:

> A franchisor intent upon engaging the machinery of the PMPA to terminate a franchise or nonrenew a franchise relationship with a franchisee who has filed a petition for relief under the Code (or against whom an involuntary petition has been filed) must consider the effect of the automatic stay upon the franchisor's ability to exercise its PMPA rights....
>
> The case law that has emerged under Section 362(a) would clearly indicate that the automatic stay prevents a franchisor from sending a PMPA Notice absent appropriate relief from the stay....
>
> Given the applicability of the automatic stay to the PMPA termination and nonrenewal process, there is a need for the franchisor to proceed in the bankruptcy court to obtain relief from the stay under Section 362(d) prior to sending a PMPA Notice. The franchisor is well advised to promptly pursue such relief. As previously observed, unless a franchisor promptly furnishes the PMPA Notice, it may waive its right to rely on a specific occurrence as a ground for termination or nonrenewal because of the passage of time....
>
> Action taken by a franchisor under the aegis of the PMPA, but in disregard of the automatic stay, is frought with risk. It is well settled that an action taken in violation of the stay is void and without effect....

*Id.* at 220–23 (footnotes omitted).[9]

In this case, since the notice of termination was made in violation of the automatic stay, it is void and without effect. Thus, Amoco is not entitled to terminate the franchise, and relief from the stay is not appropriate.

 Amoco also argues that it is entitled to relief from the stay under 11 U.S.C.A. § 362(d)(2) (West 1979) because Joyner Oil Company has no equity in the Amoco franchise, and that it is not necessary for an effective reorganization. Specifically, Amoco argues that there is no reasonable prospect for an effective reorganization.[10] Amoco has presented no evidence sufficient for the Court to grant relief on these grounds. Joyner Oil Company has implemented a plan to cut costs in its business, and the Court is persuaded that there is a reasonable chance that Joyner Oil Company may reorganize. For the same reasons, the Court is persuaded that the case should not be dismissed.

Debtors request an award of costs, attorney's fees, and damages. Since Debtors have made no showing that such an award is proper, the request must be denied.

---

**9.** Courts have held that other notices given in violation of the automatic stay are without effect. *See In re Penfil,* 40 B.R. 474, 11 Collier Bankr.Cas.2d 178 (Bankr.E.D.Mich.1984) (recordation of sheriff's deed); *Buffkin v. Goodson (In re Goodson),* 12 B.R. 883 (Bankr.S.D.Fla.1981) (landlord's notice to vacate premises); *R.S. Pinellas Motel Partnership v. Ramada Inns, Inc. (In re R.S. Pinellas Motel Partnership),* 2 B.R. 113, 5 Bankr.Ct.Dec. 1292, 1 Collier Bankr.

Cas.2d 349 (Bankr.M.D.Fla.1979) (notice to terminate motel franchise).

**10.** The use of "effective reorganization" in § 362(d)(2) implies that there must be a reasonable prospect for reorganization. *Terra Mar Development Corp. v. Terra Mar Associates (In re Terra Mar Associates),* 3 B.R. 462, 6 Bankr.Ct. Dec. 150 (Bankr.D.Conn.1980).