Bruce LIPPO, d/b/a "Walden-Woodfield Service Station," Plaintiff-Appellee,

v.

MOBIL OIL CORPORATION, Defendant-Appellant.

No. 84–1175.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1985.

Decided Oct. 30, 1985.

Fred E. Schulz, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellant.

Michael R. McKenna, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

For a number of years plaintiff Bruce Lippo operated a gasoline service station in Schaumburg, Illinois, as a franchisee of the defendant Mobil Oil Corporation. This case arises from Mobil's attempt to termi-

nate the franchise prior to its expiration. After lengthy proceedings below, Lippo obtained judgment for $67,500 and an amount of attorney's fees to be determined. Mobil has appealed, raising five issues: 1) whether the attempted termination was permitted under the several franchise agreements or the Petroleum Marketing Practices Act, Pub.L. No. 95–297, 92 Stat. 322 (1978) (the "PMPA"), codified at 15 U.S.C. §§ 2801–2841; 2) whether the damages are proper; 3) whether summary judgment for Lippo on Mobil's counterclaim was proper; 4) whether Lippo is entitled to attorney's fees; and 5) whether denial of attorney's fees to Mobil on Lippo's punitive damages claim was proper. We affirm the district court in part and reverse in part.[1]

## I.

From 1974 until 1982 Lippo operated a Mobil service station in Schaumburg, Illinois. From October 1, 1979, through September 30, 1982, the franchise was governed by a series of documents executed on March 1, 1979, as well as the PMPA, which had become effective upon enactment on June 19, 1978. Provisions of these agreements will be set out as necessary to our analysis.

On September 29, 1980, Lippo purchased on the spot market 7500 gallons of non-Mobil gasoline.[2] The non-Mobil gasoline was delivered to the station at 2:00 p.m. that afternoon, and sold to the public through Mobil equipment, and under Mobil's signs until 4:00 p.m. September 30, 1980.[3] Under Mobil's direction Lippo then covered Mobil's pumps and signs with plastic and masking tape. He continued to sell the remaining non-Mobil gasoline, and also sold Mobil gasoline that was delivered on October 1, 1980.[4]

---

**1.** There are a number of unpublished district court memoranda, opinions, orders and decisions in the record. References to them will be made as follows:
(1) Temporary Restraining Order, Feb. 13, 1981, "TRO";
(2) Preliminary Injunction Memorandum Opinion and Order, March 5, 1981, "Prelim. Inj.Op.";
(3) Summary Judgment Decision, Jan. 14, 1982, "Sum.J.Op.";
(4) Judgment Order and Injunction, May 3, 1982, "Perm.Inj.Op.";
(5) Decision on Judgment n.o.v. or new trial motion, July 13, 1983, "JNOV Op."; and
(6) Decision on attorney's fees motions, Aug. 7, 1984, "Att'y Fees Op."
The evidentiary hearing on the preliminary injunction motion was held before, and the opinion deciding the matter was written by, Judge Decker. Prelim.Inj.Op. at 1, App. 125. The other decisions are by Judge McMillen. The reference "App." is to the joint appendix.

**2.** Lippo testified that he purchased the gasoline with the encouragement of three Mobil marketing representatives after he had been informed by Mobil that he could not be guaranteed delivery of Mobil gasoline until after he expected to run out. The marketing representatives denied ever having made the encouraging statements. In his memorandum opinion and order after the hearing on the preliminary injunction motion Judge Decker doubted Lippo's testimony on this point, and found that even if the facts were as Lippo testified, the statements would not waive Mobil's rights. Prelim.Inj.Op. at 3–6, App. 127–30. Judge McMillen adopted this find-

ing in his summary judgment decision. Sum. J.Op. at 4–5, App. 251–52.

**3.** The gasoline was delivered by Athen's Cartage, which is not a common carrier used by Mobil to haul its products in the Chicago area. The gasoline was ordered from Sweeney Oil, a distributor of Texaco gasoline and three other brands. Lippo assumed the gasoline was Texaco gasoline and Mobil apparently also believes it was Texaco. *See* Lippo Deposition (Feb. 25, 1981) at 46, App. 160; Mobil Reply Br. at 17.

**4.** The dissent rests on a web of assumptions that we are unwilling to adopt. Lippo's one-time use of non-Mobil gasoline occurred during a period of gasoline shortage when Lippo apparently feared he would have no gas to sell to his customers. Prelim.Inj.Op. at 3–4, App. 127–28. It is possible that Mobil's employees encouraged the unauthorized purchase. *See supra* note 2. What the dissent calls "fraud" may have been only a small businessman's (misguided) effort to stay in operation. The record also discloses that Mobil had opened full self-service stations in the area near Lippo's station. *See* Lippo Br. at 7.

The dissent refers to Mobil's concern that, if leaded gas were sold as unleaded, Mobil might be subject to fines or lawsuits. But there is no evidence that Lippo would have knowingly sold a deleterious product. If we are to speculate freely, it is possible that the non-Mobil gas was in no way distinguishable from Mobil gas—in fact it might, through some quirk in the chain of distribution, have come from the same refinery.

On November 12, 1980, Mobil sent Lippo a Notice of Termination in response to his sale of non-Mobil gasoline.[5] The notice charged Lippo with violation of paragraphs 7(d) and 8 of the Service Station Lease and paragraphs 6 and 12 of the Retail Dealer Contract, and stated that the franchise would terminate on February 13, 1981.

On February 13, 1981, Lippo initiated the present action. His amended five-count complaint states claims for promissory estoppel, fraudulent misrepresentation, breach of contract, waiver and violation of the PMPA. On February 13, 1981, Lippo obtained a temporary restraining order enjoining Mobil from terminating the franchise. The TRO was subsequently extended and later converted first to a preliminary and then to a permanent injunction by Judges Decker and McMillen. The complaint prayed for injunctive relief and for damages for lost profits and diminution in value of the automobile service and repair operation at the service station alleged to be caused by the attempted termination. Lippo remained in possession of the service station premises at all times. Pursuant to the injunctions Mobil continued the franchise relationship until the agreement expired on September 30, 1982. As could be expected, Mobil did not renew the franchise agreement.

Mobil filed an amended counterclaim on February 24, 1981. Its five counts alleged violations of sections 32(1)(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) & 1125(a), the Illinois common law of unfair competition, the Illinois Uniform Deceptive Trade Practices Act, ILL.REV.STAT. ch. 121½, ¶ 311 et seq., and breach of contract. All of Mobil's counterclaims are predicated upon Lippo's sale of non-Mobil gasoline through pumps and facilities of Mobil and under its trademarks and name.

The parties filed cross motions for summary judgment on liability. Mobil argued that misbranding was such a serious viola-

tion of the agreement that it could not be cured, and, even if the default was cured, Mobil did not violate the PMPA. Lippo argued that the default could be and had been cured, and so the attempted termination violated both the agreement and the PMPA.

On January 14, 1982, the district court granted summary judgment for Lippo on his breach of contract (Count III) and PMPA (Count V) claims and on all claims of Mobil's counterclaim. Mobil's cross motion for summary judgment was granted on Lippo's promissory estoppel (Count I), fraudulent misrepresentation (Count II) and waiver (Count IV) claims, but denied as to Counts III and V. The district court reasoned that, although Lippo violated his franchise agreement and the PMPA, his misbranding and commingling of non-Mobil gasoline was excused by the ten day cure provision of the Supplemental Agreement. The court found Lippo had cured his violation by selling off all the non-Mobil gasoline within ten days, and entered its judgment order and permanent injunction enjoining the termination.

A trial on damages was conducted in May 1983. Lippo asserted that he had sustained a loss of profits and a diminution in the value of his automobile service and repair operation because of his fear of termination. A jury returned verdicts in Lippo's favor in the amount of $67,500. Mobil's post-trial motion for judgment n.o.v. or a new trial was denied.

In January 1984 the district court conducted a hearing on Lippo's claim for punitive damages under the PMPA. A finding was made in Mobil's favor at the close of Lippo's evidence. Final judgment was entered on January 12, 1984, and this appeal followed.[6] The district court entered an order granting Lippo his attorney's fees in connection with his compensatory damages claim only (in an amount to be determined)

---

5. This was the second termination notice Mobil sent to Lippo. The earlier notice was sent on October 7 or 8, 1980, but was withdrawn by Mobil because it contained errors. Only the notice of November 12 is at issue in this suit.

6. Lippo has not filed a cross appeal challenging any of the rulings in Mobil's favor.

and denying Mobil's request for attorney's fees with respect to Lippo's punitive damages claim.

## II.

■ Mobil's first argument is that it was entitled to terminate its franchise relationship with Lippo after Lippo sold non-Mobil gasoline under Mobil's mark and name and through Mobil's pumps and facilities. The district court ruled that the franchise agreements gave Lippo a right to cure the default, and that he had done so,[7] and thus that Mobil's attempted termination was a breach of the franchise agreements and a violation of the PMPA. Mobil argues that the franchise agreements between itself and Lippo did not allow Lippo to cure his sale of non-Mobil gasoline, and hence that it did not breach the franchise agreements or violate the PMPA.

The franchise relationship between Mobil and Lippo is evidenced by five documents: (1) the Retail Dealer Contract, (2) the Service Station Lease, (3) the Supplemental Agreement, (4) the Sign and Equipment Rider, and (5) the Equipment Loan Agreement. These documents were all executed on March 1, 1979. All the documents were form contracts drafted by Mobil and were executed by Lippo as presented.

Paragraph 6 of the Retail Dealer Contract expressly prohibits the sale of non-Mobil gasoline through Mobil equipment. It provides:

6. *Brand Names, Trademarks, Advertising.* Buyer shall use Seller's trademarks and brand names to identify and advertise Seller's products, and shall not use such trademarks and brand names for any other purpose. Buyer shall not mix any other products with Seller's products or adulterate them in any way, and shall not use Seller's trademarks or brand names in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products. All advertising, including color schemes, of Seller's products shall be subject to Seller's approval. Any violation of the provisions of this paragraph by Buyer shall give Seller the right to immediately terminate this contract. On any termination of this contract, Buyer shall cause all reference to Seller and all use of Seller's color schemes, trademarks, brand names, slogans and advertising to be discontinued and shall return to Seller all such advertising and promotional material in Buyer's possession. Buyer acknowledges and recognizes that injunctive relief is essential for the adequate remedy of any violation of the provisions of this paragraph by Buyer.

App. 31. In relevant part, paragraph A of article 4 of the Supplemental Agreement provides:

A. The duties and obligations set forth in this supplemental agreement, the Service Station Lease and the Retail Dealer Contract are agreed by the parties to be material to the relationship between Mobil and Dealer. The parties hereby agree that should either party default in the performance of any duty, responsibility or obligation imposed by this supplemental agreement, the Service Station Lease or the Retail Dealer Contract, and such default continue uncorrected for ten (10) days after written notification of such default (or if the default cannot be corrected within ten (10) days, if the work of correcting same has not been commenced within such period) then the party aggrieved by such default may forthwith upon additional written notice to the other party given, terminate the Service Station Lease and the Retail Dealer Contract, and cease doing further business with the other party as of the date of said notice, unless a longer time be required by law. In the event a longer period is required by law, the parties shall cease doing further business at the end of the minimum period required by such statute.

App. 42.

Paragraph 6 of the Retail Dealer Contract imposes a duty not to sell non-Mobil

---

**7.** The dissent makes an extended argument about whether Lippo could cure the purchase of non-Mobil gasoline without pumping out the bottom of the storage tanks. Both district judges have found as fact that, under the circumstances of this case, the cure was adequate.

products through Mobil equipment or un-der Mobil signs, and gives Mobil a right to immediate termination if the provisions of the paragraph are violated. Article 4A of the Supplemental Agreement applies to *"any* duty, responsibility or obligation im-posed by ... the Retail Dealer Contract" (emphasis supplied) and gives a defaulting party the right to cure within ten days before the Retail Dealer Contract can be terminated. Mobil argues that the ten day

cure provision of article 4A does not apply to the duties and obligations specified in paragraph 6.[8]

Mobil's first argument in support of its position is the assertion that the decision in *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984), controls this case. *Wisser* arose out of a challenge to the termination of a franchise relationship governed by contract provisions virtually identical to those at issue here.[9] The facts of *Wisser*,

**8.** Counsel for Mobil stated at oral argument that the cure provisions in question are no longer part of Mobil's form contracts.

**9.** Paragraph 6 of Wisser's retail dealer contract was identical to paragraph 6 of Lippo's Retail Dealer Contract. Although Wisser's franchise agreement did not include a separate Supple-mental Agreement, the rider to paragraph 12 of Wisser's Retail Dealer Contract contained a cure provision virtually identical to that of article 4A of Lippo's Supplemental Agreement with one exception—the time period for curing a default was twenty days rather than ten days. *Wisser*, 730 F.2d at 57–58 & n. 3.

Printed paragraph 6 of Wisser's Retail Dealer Contract provided:

6. *Brand Names, Trademarks, Advertising.* Buyer shall use Seller's trademarks and brand names to identify and advertise Seller's prod-ucts, and shall not use such trademarks and brand names for any other purpose. Buyer shall not mix any other products with Seller's products or adulterate them in any way, and shall not use Seller's trademarks or brand names in connection with the storage, han-dling, dispensing or sale of any adulterated, mixed or substituted products. All advertis-ing, including color schemes, of Seller's prod-ucts shall be subject to Seller's approval. Any violation of the provisions of this paragraph by Buyer shall give Seller the right to immedi-ately terminate this contract. On any termi-nation of this contract, Buyer shall cause all reference to Seller and all use of Seller's color schemes, trademarks, brand names, slogans and advertising to be discontinued and shall return to Seller all such advertising and pro-motional material in Buyer's possession. Buyer acknowledges and recognizes that in-junctive relief is essential for the adequate remedy of any violation of the provisions of this paragraph by Buyer.

The typewritten rider to paragraph 6 provided:

6. Nothing herein shall be construed to prevent Buyer from dispensing for sale prod-ucts other than Seller's at Buyer's place of business during the original term of this con-tract, or any extension or renewal thereof, provided that the terms hereof are fully com-plied with regarding Seller's brand names,

trademarks and advertising. In the event Seller shall become unable to supply the prod-ucts covered hereunder, and if such inability shall continue without interruption for a peri-od of forty-five (45) days or more, Buyer agrees that, upon the expiration of said forty-five (45) day period and upon notice from Seller, Buyer shall cease dispensing any prod-ucts other than Seller's through Seller's dis-pensing equipment.

Wisser's printed paragraph 12 provided:

12. *Termination.* If Buyer had made any false or misleading statement in his Dealer Application Form CO–303, or has failed to make prompt payment of any sums due Seller under this contract or Seller's retail credit program, or if Buyer is otherwise in default hereunder, Seller may on notice to Buyer terminate this contract or may suspend deliv-eries during default. If any insolvency, bank-ruptcy or receivership proceedings are insti-tuted by or against Buyer, or if Buyer takes advantage of any law for the benefit of debt-ors or if any execution or levy shall issue against Buyer or Buyer's effects, or if any lease or sublease from Seller to Buyer cover-ing the premises is terminated, this contract shall automatically terminate. Any termi-nation shall be without prejudice to Seller's accrued rights. If Buyer is indebted to Seller at time of termination, title to Buyer's unsold products, in good condition, bought from Sell-er shall, on notice to Buyer, revest in Seller who shall apply the amount charged therefor against such indebtedness.

The typewritten rider to paragraph 12 provided:

12. The parties hereby agree that should either party default in the performance of any duty, responsibility or obligation imposed by this Contract, and such default continues un-corrected for twenty (20) days then after writ-ten notification of such default (or if the de-fault cannot be corrected within twenty (20) days, if the work of correcting same has not been commenced within such period) the par-ty aggrieved by such default may upon addi-tional written notice to the other party given, terminate this Contract, and cease doing fur-ther business with the other party as of the date of said notice, unless a longer time be

however, are quite different from the instant facts because they suggest that the dealer had engaged in a continuing practice of selling misbranded gasoline. There was evidence before the district court that Wisser had misbranded for as long as six months before Mobil was able to confirm it and commence termination proceedings. There was also evidence Mobil had warned Wisser on several occasions over this period of its suspicions. Finally, Wisser owned his station and so was not evicted from the premises by the termination.[10] *Wisser,* 730 F.2d at 56, 60.

The district court in *Wisser* denied preliminary injunctive relief to the franchisee on the grounds that the balance of hardships favored the franchisor and the franchisor would prevail on the merits. The Second Circuit affirmed. Wisser had argued that the cure provision of the rider to paragraph 12 applied to defaults listed in paragraph 6 of his contract. The Second Circuit rejected this argument as "not withstand[ing] an examination of the language and the structure of the contract." *Wisser,* 730 F.2d at 58. The court reasoned that

> Printed para. 12 provides for termination "on notice" for defaults generally, and printed para. 6 dispenses with notice for certain defaults, including the "use [of] Seller's trademarks or brand names in connection with the storage, handling, dispensing or sale of any ... substituted products." The typewritten rider to para. 12 expands it to require notice of deafult and a 20-day opportunity to cure before notice of termination can be given. The typewritten rider to para. 6 adds to it express permission to sell non-Mobil products, but not to misbrand. The rider does not modify or eliminate Mobil's right granted in printed para. 6

to terminate immediately for misbranding. The structure of the printed contract is thereby preserved: Para. 12 and its rider require notice and opportunity to cure for defaults generally; para. 6 and its rider specify particular defaults for which such notice and opportunity to cure are not required before termination. Wisser's default falls within para. 6; accordingly, Mobil was not required under the contract to give notice and an opportunity to cure.

*Id.*

Mobil argues that this Second Circuit decision controls this case, but we disagree. We agree that the relevant provisions of the contracts are similar, though there is evidence of individual negotiation in *Wisser* not present here.[11]

■ There are two reasons the *Wisser* decision does not control this case. The first reason *Wisser* is not dispositive is that franchise agreements governed by the PMPA are to be interpreted according to state contract law. *See Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1217–18 (7th Cir. 1982). The Second Circuit did not state whether it was applying state contract law, presumably New York law because the service station was located in New York and there is no indication that the contract was signed elsewhere or contemplated that other law would govern. Only if *Wisser* correctly applied the relevant state law and that law was identical to the law of Illinois could the decision in *Wisser* compel a result in Mobil's favor here. Mobil has not argued either of these points.

There is a second reason why the *Wisser* decision is not dispositive. Although the language in the provisions at issue in the two contracts is virtually identical, the *structure* of the contracts as wholes is not the same. The cure provision in *Wisser*

---

required by law. In the event a longer period is required by law, the parties shall cease doing further business at the end of the minimum period required by such statute.

**10.** Neither of the experienced judges who considered the Lippo-Mobil controversy in the district court was apparently persuaded, as the dissent seems to be, that Lippo is a bad actor

who, under all the circumstances presented here, deserves to lose his business. We agree that the "basic issue" is contract interpretation, but the dissent's Jovian moral judgment upon Lippo is hardly irrelevant to its conclusions.

**11.** *See infra* at 715.

was a rider to paragraph 12 of the Retail Dealer Contract that provided for notice before termination. Thus the Second Circuit determined that the "typewritten rider to para. 12 expands it to require notice of default and a 20-day opportunity to cure before notice of termination can be given.... The structure of the printed contract is ... preserved." *Wisser,* 730 F.2d at 58. Paragraph 6 was an exception to paragraph 12, and remained an exception to the expanded paragraph 12.

Lippo's contract does not have the same structure. His Retail Dealer Contract contains a paragraph 12,[12] but the cure provision of Lippo's franchise agreement is not a rider to his paragraph 12. Instead it is contained in the Supplemental Agreement, which is a separate document. Therefore, the relationship between paragraph 12 and paragraph 6 cannot help us determine whether the cure provision applies to the duties in paragraph 6. Thus even were we to agree with the Second Circuit that paragraph 6 is an exception to paragraph 12, and that paragraph 6 would remain an exception to a rider to paragraph 12 that simply "expands" paragraph 12, it would not follow that paragraph 6 is an exception to a cure provision contained in a separate document and hence not contained in paragraph 12, expanded or not. For this rea-

son, the very logic of the *Wisser* decision shows that it does not control this case. Therefore, we must proceed to an interpretation of the two provisions of Lippo's franchise agreement under Illinois law.

▪ Mobil argues that because paragraph 6 gives it a right to terminate immediately for violation of one of the duties recited there, and article 4A requires that it give Lippo ten days to cure any default, the two provisions conflict.[13] Mobil argues that in such circumstances it is proper to apply the principle that when there are conflicting general and specific provisions relating to the same subject in a contract, the specific provisions should control. *Gordon v. Dolin,* 105 Ill.App.3d 319, 61 Ill.Dec. 188, 434 N.E.2d 341 (1st Dist.1982); *see Lehman v. United States,* 139 F.Supp. 10 (N.D.Ill.), *aff'd,* 239 F.2d 139 (7th Cir. 1956). Because, Mobil contends, the paragraph 6 immediate termination provision is specific while the article 4A cure provision is general, paragraph 6 should control. Therefore, Mobil concludes, Lippo had no right to cure, violated the contract and could be terminated.

We agree with Mobil that the specific-controls-general principle is applicable, and that the provisions conflict. But we read the provisions as conflicting in a different

**12.** Paragraph 12 of Lippo's Retail Dealer Contract is much like that of Wisser's contract and reads as follows:

> 12. *Termination.* If Buyer has made any false or misleading statement in his Dealer Application Form CO–303, or has failed to make prompt payment of any sums due Seller under this contract or Seller's retail credit program, or if the business conducted by Buyer at the premises results in an excessive number of complaints by customers for unethical or sharp practices and there appears to be, in Seller's reasonable judgment, good cause for such complaints, or if Buyer is otherwise in default hereunder, Seller may on notice to Buyer terminate this contract or may suspend deliveries during default. If any insolvency, bankruptcy or receivership proceedings are instituted by or against Buyer, or if Buyer takes advantage of any law for the benefit of debtors or if any execution or levy shall issue against Buyer or Buyer's effects, or if Buyer dies, or if any disability on the part of Buyer

> prevents personal supervision by Buyer of the performance of the obligations under this contract, or if any lease or sublease from Seller to Buyer covering the premises is terminated, this contract shall automatically terminate. Any termination shall be without prejudice to Seller's accrued rights. If Buyer is indebted to Seller at time of termination, title to Buyer's unsold products, in good condition, bought from Seller shall, on notice to Buyer, revest in Seller who shall apply the amount charged therefor against such indebtedness. App. 31.

**13.** Although the franchise agreement is evidenced by five separate documents, they were executed at the same time between the same parties, for the same purpose and as parts of a single transaction, and so are to be read together and construed as a single contract. *See Nelson v. John B. Colegrove & Co. State Bank,* 354 Ill. 408, 188 N.E. 461 (1933); *Sudeikis v. Chicago Transit Authority,* 81 Ill.App.3d 838, 37 Ill.Dec. 21, 401 N.E.2d 1114 (1st Dist.1980).

way than does Mobil, and so do not agree with Mobil's conclusion.

Paragraph 6 imposes a wide variety of duties on the franchisee regarding the use of Mobil's brand names and trade marks. It also establishes a method of termination once a "violation" of one of these duties has been established. That method is, of course immediate termination. Article 4A, on the other hand, states that for any "default" of any obligation imposed by the Retail Dealer Contract, the defaulting party has ten days after written notice of the default to effect or commence a correction. Only if the default remains uncorrected after the ten day period may the aggrieved party terminate, and then only after giving further notice.

█ Mobil asserts that paragraph 6 is a (specific) "no cure" provision while article 4A is a (general) "always cure" provision. But we read article 4A as a definition of "violation" and a general provision for termination upon further notice after a "violation," that is, after an uncorrected default. Paragraph 6 is not a specific "no cure" provision, but rather a specific form of

termination (immediate instead of with further notice) for certain *violations*. Thus paragraph 6 does not conflict with the ten day correction period provision in article 4A. That is a definition of "violation." Rather, it conflicts with the general *termination* provision of article 4A (and a similar one in paragraph 12 of the Retail Dealer Contract) that requires further notice. Therefore the provision of paragraph 6 is only an exception to the termination-only-upon-further-notice provision of article 4A; it is not an exception to the correction provision. Thus Lippo had a right to cure his default. Because he did cure his default, as found both Judge Decker, Prelim. Inj.Op. at 7, App. 131, and Judge McMillen, Sum.J.Op. at 7, App. 254, it never became a violation, and Mobil had no right to terminate under either the specific or general termination provisions.[14]

█ We believe that this is the correct interpretation of the contracts. Our interpretation is further supported by the principle that a contract containing inconsistencies or conflicting terms is to be construed against the drafter.[15] *See Cedar Park*

---

**14.** This interpretation is in accord with the principle that in franchise contracts there is an implicit covenant of good faith that restricts franchisor discretion in terminating a franchise agreement to those cases in which good cause exists. *Dayan v. McDonald's Corp.*, 125 Ill. App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958, 973 (1st Dist.1984). Under the public policy of Illinois "good cause" includes a failure of the franchisee to comply with a lawful provision of the franchise agreement " 'and to cure such default after being given notice thereof and a reasonable opportunity to cure.' " *Id.* (quoting ILL.REV. STAT. 1981, ch. 121½, ¶ 704.3(b)). The test used in defining good cause centers on commercial reasonability. *Id.*

Paragraph 6 is broad—it prohibits not only selling non-Mobil gasoline as Mobil gasoline, but a host of lesser offenses such as using a sign having an unapproved color scheme. Thus, while a sale of non-Mobil gasoline as Mobil could, depending on circumstances, affect the interest of the franchisor in marketing its product, and hence would constitute good cause for termination, *see id.*, termination after some of the lesser offenses involving the details of advertising would not seem commercially reasonable absent a chance to cure. The interpretation for which Mobil argues would allow such unreason-

able terminations without a chance to cure. Thus we agree, though for slightly different reasons, with Judge Decker's statement that "Mobil's construction of the curing provision is unlikely on its face." Prelim.Inj.Op. at 7, App. 131.

Of course, the reading we adopt does not allow Mobil to terminate without allowing cure when that might be commercially reasonable, as in this case. But Mobil has only itself to blame for this, because it drafted the documents. It was Mobil that used the language "should either party default in the performance of any duty, responsibility or obligation imposed by ... the Retail Dealer Contract" in providing that the defaulter would get ten days after notice to correct the default before termination could proceed, and that used the non-identical terms "default" and "violation." If Mobil had wanted to be more precise it could have chosen to do so. And Mobil could have narrowed the provisions for "immediate termination" to matters in which good cause was clearly involved.

**15.** We are aware that this principle is a rule of last resort not to be invoked simply to reach a result favoring the party who did not draft the agreement. *Franklin Life Insurance Co. v. Commonwealth Edison Co.*, 451 F.Supp. 602, 616 (S.D.Ill.1978) (applying Illinois law), *aff'd*, 598 F.2d 1109 (7th Cir.) (per curiam), *cert. denied*,

*Cemetery Ass'n v. Village of Calumet Park*, 398 Ill. 324, 75 N.E.2d 874 (1947); *Des Plaines Motor Sales Inc. v. Whetzal*, 58 Ill.App.2d 143, 206 N.E.2d 806 (1st Dist. 1965).

In *Wisser*, on the other hand, it would have been inappropriate to invoke the principle of *contra proferentum* because, as the Second Circuit explicitly noted, "[s]everal of the printed paragraphs contain handwritten deletions and alterations, which are separately initialed by the parties." 730 F.2d at 57. Thus there was reason for the *Wisser* court to believe that the parties negotiated at least some of the terms of that contract. In the case before us, on the other hand, there were no such alterations in the contract. Here the only changes we note are two paragraphs replaced by mimeographed riders and one paragraph covered by a sticker on which is printed a form paragraph.[16]

█ Our approach also considers the principle that contract language upon which a right of forfeiture is grounded be strictly and narrowly construed. Thus if there are two possible constructions, only one of which will work a forfeiture, the construction may be adopted that will avoid the forfeiture and preserve the rights of the parties. *See Allabastro v. Wheaton National Bank*, 77 Ill.App.3d 359, 32 Ill. Dec. 831, 395 N.E.2d 1212 (2d Dist.1979). Indeed, an ambiguous "forfeiture provision will be construed against the party seeking to enforce it." 32 Ill.Dec. at 835, 395 N.E.2d at 1216.

Mobil argues that this construction allows a franchisee to repeatedly breach the contract without its being able to terminate the contract, for the franchisee could "cure" each default within ten days, and then default again. But it would be a question of fact whether a franchisee who repeatedly defaulted on a particular duty and "corrected" each default only long enough to escape termination had even "corrected" the default. The fact that there may not be a bright line between correction and noncorrection or between a few unrelated discrete defaults and a single continuing default (as in *Wisser*) does not show that the two cannot be distinguished.[17] Nor does it show that Mobil could not validly terminate a franchisee who repeatedly sold non-Mobil gasoline as Mobil—indeed who sold non-Mobil gasoline as Mobil continuously except for the tenth day after he received each notice of default. Because our interpretation does not necessarily lead to this result, this argument does not convince us that our interpretation is wrong.

Mobil makes a perfunctory assertion that Lippo could not cure the sale of non-Mobil gasoline as Mobil gasoline. We agree that selling misbranded gasoline is far different from failing to clean washrooms, and that the sale of non-Mobil gasoline as Mobil could, as a theoretical matter, for we doubt Mobil ever actually pays, subject Mobil to liability to customers whose cars are damaged by the non-Mobil gasoline. The argument Mobil gives, however, tends rather to establish the proposition that it suffered damages recoverable on its counterclaim. *See* Mobil Br. 28–31. Mobil also attempts to support its argument that this default is not curable by an analogy to the death of

---

444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). But we are not invoking the doctrine of *contra proferentum* only in order to reach a result favoring the non-drafter of the agreement. Here, when the other canons of interpretation leave a significant area of doubt, it is certainly relevant that this is a contract of adhesion.

**16.** The dissent seems to have forgotten that this contract is entirely the work of Mobil. It is Mobil that said "any" default may be cured. The dissent asks rhetorically what Mobil would have replied if Lippo had asked about the possi-

bility of curing the purchase of non-Mobil product. But there is no evidence that the contract was negotiated: Mobil could easily and unilaterally have narrowed the cure provision as it saw fit.

**17.** The two are distinguished in the Illinois Franchise Disclosure Act. Ill.Rev.Stat. 1983, ch. 121½, ¶ 701 *et seq.* Good cause termination requires notice and opportunity to cure in the case of a single breach of a lawful provision of the franchise agreement but not when the franchisee repeatedly fails to comply with the provisions of the agreement. *See* ¶ 704.3(b) & (c)(5).

the franchisee, which it claims is equally incurable. But this analogy is not persuasive because there is a separate sentence in paragraph 12 of the Retail Dealer Contract providing that the "contract shall automatically terminate" upon death of the franchisee (or upon bankruptcy). If Mobil believed the sale of non-Mobil gasoline was sufficiently like death to warrant automatic termination of the contract it could have easily said so.

But suppose the sale of misbranded gasoline could not be cured. Then as a matter of pure logic it could not be cured within ten days. Article 4A of Mobil's contract provides that "if the default cannot be corrected within ten (10) days, if the work of correcting same has not been commenced within such period" then the aggrieved party may commence termination proceedings. Here Lippo took steps to correct the misbranding well within the ten day period. He de-identified the station and covered the pumps with masking tape and plastic. Indeed, Judge Decker found that Lippo did cure the default within ten days, Prelim. Inj.Op. at 7, App. 131, and the district court also found that Lippo complied with all of Mobil's requests within the ten-day period, Sum.J.Op. at 7, App. 254. So even if the default is not curable, what Lippo did is sufficient under the contract to constitute correction.

### III.

Mobil challenges the jury verdicts in Lippo's favor assessing a total of $67,500 in damages. Lippo claimed lost profits in his back-room repair operation and a diminution in the value of the station due to the back-room operation from November 12, 1980 (when he received the notice of termination) to March 28, 1982 (when he received proper notice from Mobil that the franchise would not be renewed when it expired). Lippo's theory was that because of the fear of termination caused by Mobil's improper notice, he was unable to invest in the necessary equipment for the repair operation and so lost profits and lost value in the franchise.

Lippo supported his lost profits claim by testimony of his business partner and accountant. Mr. Stubenrauch calculated, based on the station's repair figures for 1978, the last full year with a complete and up-to-date repair operation, that the repair operation had lost $82,000 in profits over the period. Mobil, of course, presented its own accounting testimony that yielded a far different figure for the lost profits. Mobil also tried to discredit Lippo's evidence that he actually would have obtained the necessary equipment and mechanics but for the notice of termination. Lippo supported his diminution of value claim by evidence that in early 1980 he was offered $40,000 for the franchise but that in March 1982 he was offered only $15,000 for it. Mobil presented evidence that this diminution was due to Lippo's poor maintenance of the station. The jury returned verdicts for Lippo of $45,000 on the lost profits claim and $22,500 on the diminution in value claim.

The question of credibility and weight of the evidence is within the purview of the jury, whose verdict cannot be lightly set aside so long as it has a reasonable basis in the record. *Vandenplas v. City of Muskego*, 753 F.2d 555, 560 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985); *Lenard v. Argento*, 699 F.2d 874, 882 (7th Cir.), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). Although we must make a detailed appraisal of the evidence bearing on damages, *Smith v. Rowe*, 761 F.2d 360, 368 (7th Cir.1985), we view that evidence in the light most favorable to the prevailing party, *Vandenplas v. City of Muskego*, 753 F.2d at 561. We will not reweigh the evidence, *U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1369 (7th Cir.1985), but will let the verdict stand "unless there [is] no rational connection between the evidence on damages and the verdict." *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir.1983). These rules apply to damage awards under the PMPA. *See Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380, 1388 (10th Cir.1981),

cert. denied, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982).

Mobil's first contention is that because the evidence shows that the lost profits in the repair operation were due to Lippo's own actions, Lippo has not shown the lost profits were proximately caused by the notice of termination. Essentially this claim reduces to the assertion that the jury should not have believed Lippo and Stubenrauch when they testified about what they would have done to improve the repair operation but for the notice of termination. However, as Mobil makes no argument that there are any circumstances here warranting overturning this credibility determination, we will not do so. Mobil also argues that there were no lost profits because repair work that could not be done at the station was transferred to another repair shop owned by Lippo (the "Barrington CMI" shop). Hence he did not lose any profits but simply collected them in a different pocket. But the transferred repairs were billed through Lippo's Mobil station. Therefore the profits attributable to them were factored out in Stubenrauch's calculations and so were never even claimed as lost profits.

Mobil's second contention is that no diminution in value of the franchise can be attributable to the notice of termination. Part of this contention is simply an assertion that the weight of the evidence shows Lippo's own actions caused the diminution in value, which is more properly addressed to the jury than to this court. However Mobil also presents a better argument. The diminution was claimed to be based solely on the reduction of the back room operation caused by the notice, and evidenced by the disparity in the two offers Lippo received for the station. The first offer was in early 1980, for $40,000. However, the evidence is uncontradicted that Lippo was not operating *any* backroom repair operation at that time. Thus the offer could not have included anything for the actual repair operation. The second offer was in March of 1982, for $15,000. At this time Lippo had a fairly complete repair

operation. Therefore, Mobil argues, there was no diminution in value due to the notice of termination. But Lippo's claim does not depend on the contention (admittedly false) that he had less of an actual repair operation at the time of the second offer than at the time of the first offer. Rather, his claim is that he would have had an even greater repair operation at the time of the second offer but for Mobil's notice of termination, and therefore would have gotten a better offer the second time.

But even based on this claim the verdict is not supportable. If we allocate the full value of the second offer to the almost complete repair business, its maximum value was $15,000. The value of a wholly potential repair operation presumably could not exceed the value of a complete, up-to-date actual repair operation. It is hard for us to understand how the value of the remaining undeveloped potential repair operation (which is all that the notice could have precluded and is what Lippo seeks) could possibly equal $22,500. Suppose, for argument's sake, that the almost complete repair operation of March 1982 was three quarters complete. Then the maximum value of the remaining undeveloped one quarter precluded by the notice would seem to be at most $5000. The jury verdict cannot be correct, but we are unable to make an accurate apportionment. On remand the district court should, if the parties are unable to agree on a reduction, offer the plaintiff an appropriate remittitur and, if the remittitur is not accepted, order a new trial on the diminution of value theory of damages. *See Joan W. v. City of Chicago*, 771 F.2d 1020, 1025 (7th Cir.1985).

Mobil's final contention is that even on Lippo's theory of damages there should not have been any lost profits awarded after April 15, 1981. By that time Lippo had set up a repair operation at the station by moving equipment and a mechanic from the Barrington CMI shop. The repair operation was substantial but not complete, because it lacked a number of important machines. Although this argument indicates Lippo should not have received all the dam-

ages for lost profits he claimed, it really goes to the weight of the evidence, and Mobil made it to the jury. Apparently Mobil made these arguments quite persuasively, for the jury substantially reduced Lippo's claim. We will not overturn that verdict simply because the jury did not reduce Lippo's claim as much as Mobil would have liked. There is a reasonable evidentiary basis for the jury's verdict on lost profits and we will let it stand.

## IV.

■ Mobil next argues that the district court erred in granting summary judgment for Lippo on Mobil's counterclaim. The counterclaim alleged trademark infringement in violation of the Lanham Act (Counts I and II), violation of the Illinois law of unfair competition, (Count III), violation of the Illinois Deceptive Trade Practices Act (Count IV), and breach of contract (Count V). The district court reasoned that although the sale of non-Mobil products under the Mobil trademarks could constitute a violation of the Lanham Act, Lippo had "de-identified his station and notified his customers of the variations in his supply," Sum.J.Op. at 8, App. 255, and so had not sold non-Mobil gasoline under the Mobil trademark.[18] The court then granted summary judgment for Lippo on all counts of the counterclaim.[19]

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In determining whether the moving party has shown there to be no material factual dispute, the court must view the

evidence and all inferences to be drawn from it in the light most favorable to the opponent of the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Landgrebe Motor Transport, Inc. v. District 72, International Association of Machinists*, 763 F.2d 241, 243–44 (7th Cir. 1985).

There is no dispute that from 2:00 p.m. on September 29, 1980 until 4:00 p.m. the following day Lippo sold Texaco gasoline under Mobil signs and trademarks and through Mobil pumps. Nor is there any dispute that Lippo de-identified his station at that time (though apparently he continued to accept Mobil credit cards). Thus Mobil's counterclaim can at most be for damages incurred during the initial twenty-six hour period, and Mobil does not argue that it is for any more than that. Mobil Br. 35; Mobil Reply Br. 15.

Lippo argues that there is no dispute that he orally informed all customers during the initial twenty-six hour period that they were receiving non-Mobil gasoline, and claims that the district court found such as a matter of fact. The statement in the Summary Judgment Opinion that Lippo refers to, quoted above, seems to us to refer only to the subsequent period. Lippo further supports his claim by reference to a statement in his Memorandum in Response to Mobil's motion for summary judgment, Record Item 64, App. 204, 214. This statement is mere argument. Lippo's affidavit, appended to that Memorandum in Response, contains the following statement:

> On September 29, 1980, immediately after receiving a shipment of gasoline from an outside supplier, I instructed my em-

---

**18.** The district court did not discuss the breach of contract count. Given its determination that Lippo had a contractual right to cure, this was proper. Because we have also concluded that Lippo has a right to cure, we believe it was not error to grant summary judgment for Lippo on this count of Mobil's counterclaim.

**19.** The court also reasoned that because Mobil had stated in its Memorandum in Opposition that "the only issue to be resolved by the court is whether this violation is excused by either the alleged conduct of Mobil's marketing represent-

atives or the 'cure' provision contained in the parties' Supplemental Agreement," Sum.J.Op. at 8, App. 255 (quoting Mobil's Memorandum in Opposition at 3, Record Item 70), and the court had found the cure provision did excuse Lippo's action. Mobil had apparently conceded to entry of summary judgment against it on the counterclaim. Neither party addresses the district court's waiver rationale. We have examined Mobil's Brief in Opposition and do not believe that we can uphold the district court's ruling on the theory that Mobil waived its counterclaims.

ployees to advise the customers that we were selling gasoline not procured [sic] directly through Mobil.

App. 218, ¶ 1. There are a number of reasons this cannot support Lippo's claim. First, there is no statement that the employees carried out Lippo's instruction, and in his testimony at the preliminary injunction hearing Lippo stated "I have no control over my employees, sir. I cannot force people to do things that I tell them to do." App. 157. Second, Lippo's instruction was merely to tell customers the gasoline had not been "procured directly through Mobil," not that it was non-Mobil gasoline. A customer who actually received the instructed notice might well think that Lippo had got Mobil gasoline through an independent distributor instead of directly from Mobil. The record does not disclose whether or not this was a possibility.

The evidence about whether Lippo's customers were advised that they were receiving non-Mobil gasoline is in conflict. One of Lippo's employees, Guy Waldorf, stated in an affidavit that he "informed all gasoline customers that we had received a shipment of gasoline from an alternate source pursuant to the instructions given to me by BRUCE LIPPO." App. 221. In his deposition Waldorf apparently testified that he specifically recalled telling one customer, a Mr. Roach, that the gasoline he was purchasing was from an alternate supplier. *See* Mobil Reply Br. at 16 n. 11. However, Mr. Roach was in Philadelphia on

September 29, 1980, and did not purchase any gasoline from Lippo's station. Roach Statement (Record Item 329) at 3–4.

Even if Lippo had told the customers that the gasoline was from an alternate supplier, a material fact in dispute,[20] this would not necessarily show that the customers clearly understood they were receiving non-Mobil gasoline through the Mobil pumps, under the Mobil signs and trademarks and paid on their Mobil credit cards. Because there are disputed issues of material fact, it was improper to grant summary judgment for Lippo on the Lanham Act, Illinois Deceptive Trade Practices Act and unfair competition counts of Mobil's counterclaim. Of course, we express no opinion as to whether Mobil will be able to establish all the elements for liability on any of these counts or any damages it may have suffered.

V.

Mobil's final arguments concern attorney's fees. Both parties filed motions for attorney's fees. The district court granted Lippo's motion for fees incurred in obtaining compensatory damages, but denied it in regard to exemplary (punitive) damages.[21] Mobil was denied fees incurred in defending Lippo's failed punitive damages claim. Att'y Fees Op., App. 390.

Section 2805(d) of the PMPA provides for attorney's fees. Subsection 2805(d)(1)(C) provides that if the franchisee prevails on an action under section 2805(a), which gives

---

**20.** Count I of the counterclaim alleges a violation of § 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), under which a cause of action exists (assuming the requisite connection with interstate commerce) when an individual uses a trademark: (1) without consent; (2) in connection with the sale of goods; (3) where such use is likely to cause confusion or to deceive purchasers as to the source or origin of the goods. *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir.1968). Count II alleges a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which is violated when goods or services are involved, interstate commerce is affected and there has been a false designation of the origin of the goods. *N.S. Meyer, Inc. v. Ira Green, Inc.,* 326 F.Supp. 338 (S.D.N.Y.1971). Count III alleges a violation of the Illinois common law of unfair competition,

under which a party unfairly competes with another by creating a likelihood of confusion as to the source or the origin of the goods involved. *National Football League Properties, Inc. v. Consumer Enterprises, Inc.,* 26 Ill.App.3d 814, 327 N.E.2d 242 (1st Dist.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390 (1975). Count IV alleges a violation of ILL.REV.STAT. ch. 121½, ¶ 312 (1983), which prohibits passing off goods or services as those of another or otherwise causing the likelihood of confusion or misunderstanding as to the nature or origin of the goods. What Lippo's employees said to customers, if anything, when those customers bought non-Mobil gas under Mobil trademarks is obviously material to these claims.

**21.** Lippo does not appeal this limitation.

the franchisee a cause of action if the franchisor fails to comply with the requirements of sections 2802 or 2803, the franchisee is entitled to reasonable attorney and expert witness fees to be paid by the franchisor. Subsection 2805(d)(3) of the PMPA allows the court in its discretion to award reasonable attorney's fees against the franchisee if the court finds that the franchisee's action was frivolous.

Mobil's argument concerning the fees awarded to Lippo is that Lippo did not prevail on an action brought under section 2805(a) because Mobil could have terminated the franchise under the PMPA but for the Retail Dealer Contract and Lippo prevailed only because of the cure provision of article 4A. Section 2805(a) gives the franchisee a cause of action if the franchisor fails to comply with the requirement of section 2802. Section 2802 prohibits all terminations of franchises unless the notification requirements of section 2804 are met and the termination is based on a ground described in subsection 2802(b)(2). One of the grounds described is the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable." 15 U.S.C. § 2802(b)(2)(C). An example of such an event is the "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee." 15 U.S.C. § 2802(c)(10). Mobil argues that because its notice met the requirements of section 2804 and, as the district court found, Sum.J.Op. at 3, App. 250, the sale of 'non-Mobil gasoline is an expressly approved ground for termination under the PMPA, Lippo did not and could not prevail under section 2805(a). Therefore, Mobil concludes, Lippo is not entitled to attorney's fees.

We take it as obvious that if Lippo had brought his action in state court and relied solely on the contract provisions, he could not recover these fees. *Thomas v. Amoco Oil Co.*, 455 So.2d 1187, 1191 (La.Ct.App. 4th Cir.1984). However, we do not believe the same result applies here.

Lippo brought one count of his action under the PMPA, and he obtained preliminary injunctive relief under it (and the relief was later made permanent). The standards for getting preliminary injunctive relief under the PMPA are lower than those governing such relief generally. *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir.1984); *Greco v. Mobil Oil Corp.*, 597 F.Supp. 468, 472 (N.D.Ill.1984); *see* 15 U.S.C. § 2805(b)(2). Mobil does not argue either that a preliminary injunction would have been proper under the general principles or that relief here was granted under the general principles. The latter is certainly not the case. *See* Prelim.Inj.Op. at 8, App. 132. A franchisee who obtains injunctive relief under the PMPA is entitled to attorney's fees even though the franchisee does not obtain either actual or exemplary monetary damages. *Lyons v. Mobil Oil Corp.*, 554 F.Supp. 199 (D.Conn. 1982). *But see Noe v. Mobil Oil Corp.*, 503 F.Supp. 213 (E.D.Mo.1980) (not awarding attorney's fees in absence of an award of actual damages; no reasoning given).

There is a second reason why we cannot accept Mobil's contention that Lippo was not entitled to fees. While Mobil could have terminated but for the contract provision, we believe Lippo prevailed both on his contract claim and on his PMPA claim. The PMPA is remedial legislation that "must be given a liberal construction consistent with its overriding purpose to protect franchisees." *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir.1982). In an action brought under section 2805(a) the franchisee has the burden of proving termination of the franchise. (This must really mean attempted termination if the injunctive relief is to be of any use.) The franchisor then bears the burden of going forward with evidence to establish as an affirmative defense that the termination is permitted under section 2802(b). 15 U.S.C. § 2805(c); *Brach v. Amoco Oil Co.*, 677 F.2d at 1219; *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1390 (10th Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982).

Here Lippo clearly carried his initial burden. For us to reverse the fee award we would have to find Mobil succeeded on its affirmative defense. But that we are not prepared to do. Mobil claimed termination was proper under sections 2802(b)(2)(A) and 2802(b)(2)(C). As noted above, section 2802(b)(2)(C) provides for termination for an event relevant to the franchise relationship, of which the sale of misbranded gasoline is an example. But termination is allowed only if it "is reasonable." Mobil asks us to hold, in essence, that termination in violation of the franchise contract could be reasonable. We do not believe that a termination can be reasonable, even if based on an event for which termination would otherwise be reasonable, when the contract gives the franchisee a chance to correct that default.

A similar line of reasoning applies to the attempt to base the termination on section 2802(b)(2)(A), which allows, under certain conditions regarding knowledge not relevant here, termination for a failure by the franchisee to comply with a provision of the franchise when the provision is reasonable and of material significance to the franchise relationship. Even if sale of non-franchisor gasoline as gasoline of the franchisor would normally be a failure to comply with a reasonable and materially significant provision, here Mobil gave Lippo the right to correct such a failure. We do not believe that a franchisor can give such a right of correction in its contract and then turn around and try to terminate under the PMPA without reference to that right of correction. A termination cannot be for failure to comply with a reasonable and materially significant provision of a contract when it is in violation of that contract. At least, this principle would apply when the contractual violation arises from the franchisor's failure to respect a right to correct the failure to comply with what might otherwise be a reasonable and materially significant provision of the contract.

Because Lippo sustained his initial burden, Prelim.Inj.Op. at 2, App. 126, and Mobil failed to make out its affirmative defense, Mobil cannot contend that Lippo did not prevail on his PMPA claim. This is so even though the reason underlying Mobil's failure is a contractual provision granting Lippo greater protection than he would otherwise have had solely under the PMPA.

Mobil's second contention is that it should have been granted attorney's fees in defending against Lippo's claim for punitive damages. Punitive (exemplary) damages are awardable to the franchisee if the franchisor willfully disregards the termination requirements of section 2802. 15 U.S.C. § 2805(d)(1)(B). Mobil argues that it complied with the termination and notice provisions of the PMPA and could have legally terminated Lippo but for the cure provision of the contract. *See* Sum.J.Op. at 3, App. 250. Therefore Mobil asserts it could not have willfully disregarded the requirements, and Lippo's claim for punitive damages must have been frivolous, and so it should have received attorney's fees.

The district court found that Lippo's claim was not frivolous, and denied Mobil the fees. Att'y Fees Op. at 3, App. 392. The award of fees to the franchisor is committed to the discretion of the district court. Thus the question before us is not whether it would have been proper to award fees to Mobil, but whether the trial court abused its discretion by not awarding the fees. We do not believe the court abused its discretion by denying fees under the circumstances of this case. *Cf. Van v. Mobil Oil Corp.*, 515 F.Supp. 487, 492 (E.D. Wis.1981) (declining to award fees to franchisor when franchisor prevailed on summary judgment on franchisee's PMPA claim because there had been no termination; franchisor expended little effort defending PMPA claim and did not obtain summary judgment on franchisee's state law claim).

For the reasons given above, the judgment of the district court is AFFIRMED IN PART AND REVERSED IN PART. The case is REMANDED for further proceedings not inconsistent with this opinion.

POSNER, Circuit Judge, dissenting in part.

The proposition that my learned brethren embrace in this case is that a dealer can defraud his supplier and yet the supplier be helpless to terminate him. If a statute or some other source of law required this result then one could but shake one's head in wonder at the asininity of the law. But no law requires the result. It is the contract that, in my brethren's view, requires it; in their view the supplier, though a large and vastly experienced franchisor, empowered the dealer to commit fraud yet remain a dealer in good standing.

Lippo, a franchised Mobil dealer, committed a palpable and potentially very harmful fraud against Mobil by deliberately selling another supplier's gas under Mobil's name. This was a willful breach of contract; jeopardized Mobil's trademark; deprived Mobil of revenues; and could have gotten Mobil into serious legal trouble if the bootleg gasoline had been leaded gas sold as unleaded Mobil. But because the contract contains a provision allowing the dealer to cure any default within ten days, and Lippo was caught before ten days had elapsed and was forced to cover Mobil's name on the pumps (so that the misbranding may have ceased then—though this is not certain, as we shall see), my brethren hold that Mobil's termination of Lippo was a breach of contract. Lippo defrauded Mobil, not Mobil Lippo, but in acting to prevent a recurrence of the fraud by terminating Lippo, Mobil ends up on the losing end of a breach of contract suit. This result would be a disturbing commentary on the morality and good sense of American law if Lippo had any grounds for his suit, but he does not.

A paragraph in the contract forbids Lippo to use Mobil's trademarks in connection with the sale of substituted products and provides in words that could not be clearer that "any violation of the provisions of this paragraph by Buyer shall give Seller the right to immediately terminate this contract." There was a violation and Mobil terminated the contract. That would be the end of the matter except for another provision of the contract, which allows Mobil to terminate the contract if a default goes uncorrected for more than ten days; this is the provision for cure, on which my brethren base their decision. The two provisions can easily be reconciled by confining the right of cure to breaches committed in good faith. This reading would prevent Mobil from pouncing on an unimportant and inadvertent and perhaps involuntary breach—in other words, a breach made in good faith—without exposing Mobil to fraud by its dealer. My brethren do not consider this mode of reconciliation, but instead in effect throw out the first provision.

Since liability for breach of contract is strict and since the franchise contract imposes many duties on the franchisee that he might violate accidentally (for example, his workers might fail to clean the station's restrooms one day), the provision allowing cure serves to prevent Mobil from using the pretext of an inadvertent, unimportant, and perhaps even involuntary breach by Lippo to yank his franchise. Misbranding, however, is never that kind of breach. It is not possible for a dealer to find himself accidentally selling, from Mobil's underground storage tanks and pumps, gasoline supplied by another producer. It is especially not possible in a case such as this, where the dealer handles only one brand of gas. The only storage tanks and pumps that Lippo had were tanks and pumps supplied to him by Mobil, and there was no way that Lippo could accidentally commingle Mobil gas with any other gas. It cannot have been the parties' intention, in writing a provision for cure into the contract, to give Lippo a license to commit a deliberate, serious, and inexcusable breach of a fundamental term of the contract; a license to defraud the licensor. As my brethren interpret the contract, every Mobil dealer who signs such a contract can misbrand until the eleventh day after he is caught, yet remain a Mobil dealer. That cannot be a correct interpretation.

This would be evident even without a provision in the contract expressly allowing Mobil to terminate Lippo immediately for misbranding; for "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts, § 205 (1981); see also Farnsworth, Contracts § 7.17, at pp. 526–27 (1982). The right of cure was conditional on Lippo's having acted in good faith in defaulting on his contractual obligations; for it would have made no sense for Mobil to agree to let Lippo, in the name of cure, commit serious breaches of contract with impunity, provided only that he discontinue them within ten days of Mobil's discovering them. It is to prevent such absurdities that the duty of good faith is read into every contract; and it cannot be (though my brethren imply it is) that only the franchisor has a duty of good faith, and the franchisee is free to break the contract in bad faith. The duty of good faith rests on "each party." Restatement, *supra*, § 205.

It is no answer that Mobil can sue Lippo for breach of contract. If a breach of contract is committed by conduct that is also tortious, the breach is not excused just because the victim has a right to bring a tort suit. The purpose of making a breach of contract a ground for termination by the other party is that termination—self-help— is normally a much cheaper remedy than having to bring a lawsuit, meanwhile being locked into an unwanted contractual relationship, here with someone who is not much better than a thief. The right to sue would be an especially inadequate substitute for the right to terminate in this case. Not only are Mobil's expenses of suit likely to exceed the amount of damages that can actually be collected from the owner of a gas station, but the amount of provable damages is likely to be small relative to the actual injury to Mobil. The injury is not the loss of some revenues; that is minor. The injury is the impairment of Mobil's trademarks, and cannot readily be quantified. The fact that it cannot readily be quantified does not make it trivial; and even if what Lippo did to Mobil was a trivial harm, still we must consider the implications if every Mobil dealer may deliberately misuse Mobil's trademarks, to his profit, without losing his franchise. The cumulative effects could be very serious, and can be prevented under the view my brethren take only if Mobil brings suit against every dealer emboldened by the majority opinion to engage in misbranding. It is (putting the matter with great restraint) unlikely that this is the only remedy that the parties meant to allow to Mobil.

The provision of the contract that entitles Mobil "to immediately terminate" the contract for misbranding makes this even clearer as well as creating an embarrassing question for my brethren: what does that provision mean if all breaches of contract are curable? Since the provision for cure itself allows the contract to be terminated if the default is not corrected in ten days, and since my brethren hold that misbranding is curable, it seems that the provision for immediate termination, though obviously of vital importance to the owner of a valuable trademark, has been read right out of the contract. My brethren think that the provision means only that Mobil can terminate the contract for misbranding after ten days without further notice. This would be little enough at best; actually it is nothing at all. It is true that the provision for cure requires notice before termination after the period for cure has expired, while the provision for immediate termination does not mention notice. But the distinction is unreal. You can hardly terminate a contract, before it expires, without telling the other party what you are doing to him. What would it mean for Mobil to say to Lippo, "Oh, by the way, we terminated you last year for misbranding— only we didn't bother to tell you at the time"? In any event, as we shall see, it would violate the Petroleum Marketing Practices Act for Mobil to attempt to cancel a franchise without notice. And the difference between the two contract provisions cannot be the difference between oral and written notice, because the contract requires that all notices be in writing. Mobil

cannot terminate the contract on any ground without written notice. The majority opinion indeed reads the immediate-termination provision out of the contract.

My brethren believe most improbably that despite the parties' efforts to make the contract terminable immediately if Lippo sold other suppliers' gasoline as Mobil gasoline, Lippo could do just that for as long as he could get away with it and when he was caught he could keep on selling that gasoline as Mobil gasoline for another ten days and Mobil's only remedy would be to bring a lawsuit (doubtless of little value) against Lippo. As Lippo would remain a Mobil dealer, he might decide to repeat the fraud. This, however, would probably be too much for my brethren, and they would (or at least might) then read into the contract a provision allowing Mobil to tack together successive frauds and call it one fraud not cured within ten days. They thus seem willing to interpret the contract loosely if that is necessary to avert totally absurd results—willing, indeed, to make the contract quite vague by requiring that a distinction be made between a series of individual breaches and a single "continuing" breach. But they are not willing to interpret the contract reasonably—as they could easily do by confining the provision for cure to breaches made in good faith—to avert merely absurd results.

Although the contract does not use the word "cure," we can learn something from the meaning of the term in contract law, on which see Farnsworth, *supra*, § 8.17. For example, if in a contract to sell goods the buyer rejects the seller's tender because of some defect in the goods, but the time within which the seller was to perform (that is, was to make a perfect tender of the goods) has not yet expired, the seller will be allowed to make a conforming tender within that time. See UCC § 2-508(1). This is cure in a quite literal sense; for, provided that the seller makes a conforming tender within the contractual time limits, he has averted the harm that his earlier breach threatened to do. But if it is too late to undo the harm, the attempt at cure will not excuse the breach; you cannot cure a disease after the patient has died from it. "Cure is not always possible, as in the case of a singer who does not show up on the night of the opera." Farnsworth, *supra*, at p. 613 n. 1. Lippo could no more cure his breach in selling misbranded gasoline simply by ceasing to sell it than the singer could cure her default by showing up the next night. Of course the parties to a contract can agree to a broader power of cure than the common law would give them in the absence of an express provision and they may have done that here, but the right of cure that Lippo asserts goes too far beyond the conventional boundaries to be plausibly imputed to the parties.

There is even some doubt whether Lippo's breach could be, if not cured (it could not be cured, in the sense of averted, as I have said), at least corrected—stopped—within ten days. I shall illustrate with Lippo's misbranding of regular Mobil. When Lippo put 3,000 gallons of bootleg gasoline into his "empty" regular-Mobil tank, there were still 800 gallons of Mobil in the tank. The pumps do not pump out the last 800 gallons in the tank; an "empty" tank contains this amount at the bottom. After the unauthorized purchase there were 3,800 gallons of gasoline in the tank, presumably well mixed, of which approximately 75 percent was not Mobil gasoline. When Lippo was caught out in his fraud he covered the Mobil name on the pumps and continued pumping until the tank was again "empty," that is, until there were only 800 gallons left. Of these, 75 percent (600 gallons) would not have been Mobil gasoline. Mobil then delivered 2,200 gallons of regular Mobil to refill the tank, making a total of 3,000 gallons in the tank, of which 600 were not Mobil gasoline. Thus, after Lippo's default was "cured," 20 percent of the gas in the tank was still not Mobil gas, and Lippo continued pumping this gas under the Mobil name. If this was not misbranding, which it probably was, it was adulteration—which is forbidden along with misbranding in the paragraph that gives Mobil a right of immediate termi-

nation for certain violations. The adulteration was not cured within ten days; it may never be cured, though it will decay exponentially, and eventually become insignificant, as Lippo continues buying Mobil gasoline to replenish the tank as it empties.

A semanticist or grammarian might admire the ingenuity with which the majority opinion draws refined verbal distinctions, notably that between "default" and "violation," which is the lever by which the provision for immediate termination for misbranding is eased out of the contract. The provision refers to "violation," and in my brethren's analysis a "default"—the word used in the provision for cure—becomes a "violation" when the period for cure has elapsed without correction. The violation is a moth, and the default is the caterpillar; and without the caterpillar, there can be no moth. My brethren do not consider the possibility that "default" was used in the provision for cure because it connotes a lesser breach than "violation." This distinction is supported by the dictionary, which uses words like "lack" and "neglect" as synonyms for "default" and words like "transgression" and "infringement" as synonyms for "violation." But linguistic subtlety is in any event out of place in interpreting this contract. It is not a contract between lexicographers; it was not drawn to provide hermeneutical exercises for judges. "It is the parties' linguistic reference that is relevant, not the judges'." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n. 12 (3d Cir.1980).

What we ought to ask, and use common sense and a sense of commercial reality in answering, is whether the parties would have agreed to make the ten-day cure provision applicable to misbranding if the issue had come up during the contract negotiations. It seems to me pretty obvious that Mobil would never have agreed to such an application and that for Lippo to have pressed for it would just have convinced Mobil of Lippo's unreliability and have made the negotiations collapse. Imagine Lippo saying to Mobil: "I would like to be able to sell another supplier's gas under your name for up to ten days after you catch me at it, as that will enable me among other things to enjoy the use of your premises at a much lower rent during that period." If Lippo had bought no Mobil gas for ten days his rent for the period would have been only about half of what he would otherwise have owed, assuming he bought the same volume of some other supplier's gas.

The only point I can find in favor of my brethren's position, besides the commonplace judicial sympathy, here undoubtedly misplaced, for the little man up against the vast multinational corporation (I shall come back to this point), is that the provision that allows immediate termination for misbranding also allows immediate termination for the lesser violation of failing to get Mobil's approval in advance for advertising, "including color schemes." This is not so trivial a violation as my brethren suppose, because color is part of Mobil's trademark; but as is not true of misbranding, the restrictions on advertising could be violated inadvertently, and for an inadvertent breach immediate termination might as I suggested earlier be a disproportionate sanction, and therefore one that the parties, had they considered the point, would not have wanted to impose. If Mobil had terminated Lippo for such a breach we would therefore have a difficult case and it might be possible to stretch the cure provision to cover it. But this would be limiting rather than nullifying the provision that allows immediate termination for some violations of the contract; and to say that because the provision for cure might reach a good-faith violation involving Mobil's trademarks it must therefore reach misbranding done in bad faith is a non sequitur.

Finally, my brethren's interpretation of the contract is inconsistent with the Second Circuit's decision in *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984), another case where Mobil terminated a misbranding dealer without giving him an opportunity to cure his breach. It is true that there are differences between the two contracts and

that it was even clearer in *Wisser* than it is in this case that Mobil had no intention of putting itself in the dealer's power to defraud it. The fact that Mobil is the franchisor in both cases is some additional evidence against supposing that it put itself in Lippo's power, having declined to put itself in Wisser's power. But I am particularly interested in the part of *Wisser* in which the court rejected Wisser's argument that the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.*, required Mobil to give him an opportunity to cure his violation of the franchise. Of course it is possible in theory that the Act would give a franchisee fewer rights than the franchise contract; it just is completely unrealistic. The Act (so far as *Wisser* or the present case is concerned) was passed to give gasoline dealers rights they could not get by contract. See S.Rep. No. 731, 95th Cong., 2d Sess. 17–18 (1978), U.S.Code Cong. & Admin.News 1978, p. 873.

The Act forbids an oil company to terminate a dealer without 90 days' notice unless such notice "would not be reasonable" in the circumstances, 15 U.S.C. § 2804(b)(1), in which event notice must be given as early as "is reasonably practicable," 15 U.S.C. § 2804(b)(1)(A). The Second Circuit thought that in the case of misbranding no advance notice—and hence no opportunity for cure—was required. An opportunity to cure, the court pointed out, need not be given when the default "undermines the [franchise] relationship and ... does not call for a second chance"; "the proposition that a franchisee always has the right to cure a default is obviously wrong." 730 F.2d at 59. To like effect see *JFC Investors Ltd. v. Gulf Products Division*, 608 F.Supp. 1136, 1141–42 (W.D.N.C.1985); *Amoco Oil Co. v. D.Z. Enterprises Inc.*, 607 F.Supp. 595, 600–01 (E.D.N.Y.1985); *In re Joyner*, 46 B.R. 130, 134–35 (M.D.Ga. Bkrtcy.1985); cf. *H.R.H. Service Station, Inc. v. Exxon Co., U.S.A.*, 591 F.Supp. 25, 26 (S.D.N.Y.1983); *AAMCO Industries, Inc. v. DeWolf*, 312 Minn. 95, 102–03, 250 N.W.2d 835, 839–40 (1977). These observations are even more pertinent to interpreting a contract designed to protect the interests of both parties than a statutory provision designed to protect only the franchisee.

Let us not lose sight of the basic issue. It is not whether "Lippo is a bad actor who, under all the circumstances presented here, deserves to lose his business," although as a matter of fact he is, and does. It is true that what I call fraud "may have been only a small businessman's (misguided) effort to stay in operation"—if anyone believed Lippo's testimony, but no one does (see note 2 of majority opinion). It was fraud, and we have no power to say to Mobil, it was a little fraud, and you must forgive it. Such an approach would make it impossible for a businessman to know in advance when he could terminate a contract because of misconduct by the other party to the contract. And lest my position seem hardhearted I hasten to add that twisting a contract to help the little man who is dishonest hurts the little man who is honest; a decision that makes it harder for Mobil to terminate dishonest dealers will, by increasing the risks that Mobil bears when it decides to sell gasoline through a dealer, make it more costly for Mobil to sell gasoline through dealers in general, in just the same way that making it hard for creditors to collect debts from defaulting debtors raises interest rates to all debtors. It is no answer that Mobil should go back to the drawing board and come up with an airtight contract. It is not easy to draft a contract that an unsympathetic court, a court that thinks a defrauding dealer should have another chance (or damages in lieu thereof), can't find a loophole in.

But the basic issue as I say is different. It is whether a rational franchisor would, and whether this rational franchisor did, empower his dealers to defraud him by attaching his trademark to another supplier's product. Unless as I devoutly hope the decision can somehow be limited to gasoline shortages (see note 4 in majority opinion), in which event it will merely be a sport, the surprising answer that my brethren have given to this question will send shock waves through industries that sell

their products through franchised dealers, will confirm the widespread view in the business community (among other communities) that contemporary American law is unintelligible and unjust, and, not least, will set back the cause of purposive and realistic contract interpretation.