**The ORIGINAL GREAT AMERICAN CHOCOLATE CHIP COOKIE COMPANY, INC., a Delaware corporation, Plaintiff,**

v.

**RIVER VALLEY COOKIES, LTD., an Illinois corporation, Robert M. Sigel, Paula Sigel, and B & I Drugs, Inc., an Illinois corporation, Defendants.**

**No. 91 C 860.**

United States District Court, N.D. Illinois, E.D.

Sept. 5, 1991.

Rene A. Torrado, Jr., Karen Lynn Pszanka–Layng, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., John T. Marshall, Carol Eller Kirby, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff.

Robert I. Boehm, Konstantinos Armiros, Boehm & Pearlstein, Ltd., Chicago, Ill., for defendants.

## ORDER

NORGLE, District Judge.

Before the Court on objections by plaintiff and defendants to Magistrate Judge Bucklo's Report and Recommendation filed on July 25, 1991. Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court referred motions for preliminary injunctions to the Executive Committee for assignment to a magistrate. The Executive Committee gave its consent and this case was assigned to Magistrate Judge Bucklo.

Magistrate Judge Bucklo's eighteen-page Report recommended that River Valley's motion for preliminary injunction should be granted, that no trademark violation would occur if River Valley was allowed to continue to operate its business, and that Great American's motion for preliminary injunction should be denied. Plaintiff and defendants have filed objections to the report.

The court has completely reviewed the Report on a *de novo* standard. 28 U.S.C. § 636(b)(1)(C); *United States v. Rodriguez*, 888 F.2d 519, 521 (7th Cir.1989). The Court finds the Report to be thorough, accurate, and proper and further finds all objections to be without merit.

Accordingly, the Court adopts and incorporates Magistrate Judge Bucklo's Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) as Appendix A of this Order.

IT IS SO ORDERED.

## APPENDIX A.

### REPORT AND RECOMMENDATION

ELAINE E. BUCKLO, United States Magistrate Judge.

The Original Great American Chocolate Chip Cookie Company, Inc. ("Great American"), a Delaware corporation and plaintiff-counterdefendant in this case, in August, 1985, entered into a franchise agreement with defendant-counterplaintiff Robert M. Sigel for the operation of two cookie franchises in the Chicago, Illinois area. Mr. Sigel transferred his rights to the defendant-counterplaintiff River Valley Cookies, Ltd. Mr. Sigel's obligations were guaranteed by defendant-counterplaintiff Paula Sigel, who is Mr. Sigel's wife, and by defendant-counterplaintiff B & I Drugs, Inc., a corporation owned by the Sigels. Pursuant to the agreements, the Sigels opened a cookie store in Aurora, Illinois sometime in 1986 (referred to hereafter as the "Fox Valley" facility). In October, 1990, Great American notified the Sigels that it was terminating their franchise.[1] The Sigels

continued selling cookies at the franchise location under the Great American name pursuant to an agreement with Great American while they attempted to sell the facility. However, in early 1991, discussions broke down. Great American brought this suit in February, 1991, alleging that the continued, unauthorized use of its trademarks violated its rights under the Lanham Act, 15 U.S.C. § 1117, and common law, and constituted a breach of contract. The Sigels filed a counterclaim, alleging that Great American violated the Illinois Franchise Disclosure Act, Ill.Rev. Stat., ch. 121½ ¶¶ 1706 and 1719, by various failures to disclose or misrepresentations, and by attempted termination of the franchise without good cause as defined by the Act, that it breached its contract obligations with the Sigels, and committed antitrust violations. Both sides filed motions seeking preliminary injunctions. The motions were referred to me and after the parties conducted expedited discovery, I held an evidentiary hearing. This opinion constitutes my findings of fact and conclusions of law.

There is no dispute that since January, 1991, the Sigels have continued to operate the Fox Valley facility using the Great American name without the permission of Great American. Since approximately February, 1991, when the Sigels ran out of Great American cookie batter, they have also used cookie batter purchased from another source to make the cookies. The Sigels' motion for preliminary injunctive relief asks the court to order Great American to supply it with cookie dough pending the outcome of this suit, and to allow it to operate under the Great American name pending final decision. Great American's motion seeks an injunction against any further use of the Great American name, as well as immediate eviction from the facility.

The primary issue to be decided on the parties' motions is whether Great American

---

**1.** The Sigels at one time had two stores. The other store closed earlier and is not at issue in this litigation. When I refer to the termination of the Sigels' franchise, I am referring only to the franchise with respect to the Fox Valley location. I have referred to defendants collectively as the Sigels throughout this opinion.

or the Sigels have shown a greater likelihood of success on the question whether Great American could legally terminate the Sigels' franchise under the contract and the Illinois Franchise Disclosure Act. That determination must be balanced against the other factors to be considered in determining the appropriateness of a preliminary injunction. *Roland Machinery Company v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984).

### 1. The Contract And The Illinois Franchise Disclosure Act

Section 18 of the contract between the Sigels and Great American provides that the happening of any of a series of listed events shall constitute a material breach under the contract, which shall entitle Great American to terminate the agreement. Section 20 limits the force of this section by providing that Great American shall not be entitled to the remedies under Section 18 unless either the default event "is not totally remedied and cured within five (5) days after written notice of such event is sent to Licensee" or "[t]here have been three events constituting a default under this License (whether or not similar, and whether or not within the purview of Section 18) within any twelve (12) month period."

The contract must be considered against the Illinois Franchise Disclosure Act, Ill. Rev.Stat., ch. 121½ ¶ 1719, which prohibits the termination of a franchise except for "good cause," defined insofar as pertinent here as follows:

(b) "Good cause" shall include, but not be limited to, the failure of the franchisee ... to comply with any lawful provision of the franchise or other agreement and to cure such a default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days.

(c) "Good cause" shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee:

\*    \*    \*    \*    \*    \*

(4) repeatedly fails to comply with the lawful provisions of the franchise or other agreement.

In the present case, Great American argues that the Sigels committed material breaches of the agreement constituting defaults under Section 18 of the agreement at least three times within a twelve month period, and repeatedly failed to comply with the lawful provisions of the franchise agreement. The Sigels argue that all of the "defaults" but one occurred during a relatively short period of time during which they had a bad manager, that none of them were significant, that they are being used by Great American to oust them from a successful, profitable franchise operation, and that the Illinois Act, as construed by the courts, was intended to prevent such occurrences.

### 2. Facts Relied On By Great American For Termination

The event that triggered Great American's decision to terminate the Sigels' franchise was an audit report of sales at the Fox Valley facility completed in July, 1990. The audit, by an independent company, examined sales over a three-year period. The Report concluded that while the Sigels had reported $1,165,670 in sales, actual sales were $1,206,221, or $40,551 more than reported, resulting in additional royalties due Great American in the amount of $2,839. When Great American notified the Sigels of the discrepancy (through a notice of default), the amount due, together with costs of audit, was promptly paid.

At the hearing on this motion, the parties disputed both the accuracy of the discrepancy (Great American argued it was in fact more than reported by their auditor;[2] the

---

**2.** Great American's argument is based on a letter sent from the Sigels' accountant to a prospective purchaser of the franchise after Great American's notice of termination, in which the accountant inflated the sales figures for the business. The accountant explained that it was sent by someone in his office without his review during tax season and that it mistakenly included sales tax. At any rate, there is no evidence that the numbers reported by Great American's auditor underreported sales.

Sigels said the auditor was mistaken in the amount) and the cause of it. I conclude that the Sigels' underreporting was not intentional, and that at least most of the amount would likely have been accurately reported if their accountant had informed them of the error at the time he caught it (he admits he did not tell them of the error). Furthermore, no evidence rebutted the Sigels' evidence that as to various months in which the auditor found underreporting, the cause was a difference between the month in which the accountant reported sales and the month in which the Sigels reported sales (indeed, for some months sales as a result were listed as overreported by the auditor), although the final figures computed by the auditor were not satisfactorily refuted. The auditor's report indicated that with the exception of one month in 1989, in which sales were found to be underreported in the amount of $713 (on total sales of $31,925), all of the underreported sales occurred in 1987 and 1988. The importance of this fact will be discussed later in this Report.

In the year preceding Great American's notice of termination of the franchise, Great American issued two additional notices of default to the Sigels. The first occurred in February, 1990, and stated that it was the result of back rent owed in the amount of $8,618.57. The notice of default was dated February 14, 1990. Great American received the amount due on February 15, 1990.[3] In fact, only about $115.00 of

the amount owed was for rent. The remainder was for cookie batter (the largest amount), or other items owed Great American. According to the attachment to the letter (Plaintiff's Ex. 10), most of the amount had been due on January 27, 1990, with lesser amounts due on February 1, February 8 and February 9, 1990. The notice of default also included a significant amount still owed from January, 1990, due to one or more checks that had been returned for insufficient funds. Under the contract, a default could include nonpayment of any invoice within ten days of its due date or the failure "promptly" to pay rent or invoices from suppliers. Thus, while the February 8 and 9 payments were not past due, the Sigels do not argue that the other payments were not late, as defined by their contract.[4] Under the contract, each late payment constituted a separate default. Whether, under the circumstances, this is reasonable will be considered later. The specific items and amounts involved are as follows: batter, $4856.02 (due January 27, 1990); December, 1989 "fran fer", $2,828.74 (due January 10, 1990); January, 1990 rent, $57.56 (due January 1, 1990); freight, $429.48 (due January 12, 1990); "CAM," $20.98 (due January 14, 1990); and February, 1990 rent, $57.56 (due February 1, 1990).

On June 20, 1990, Great American issued another notice of default. This one also concerned nonpayment of certain invoices. The Sigels paid the amounts owed on June 27, 1990. Although the notice of default

---

**3.** Under the contract, a franchisee was given five days following the date of a letter of default in which to cure any default. While the February 15 payment was within this time period (the amount owed was paid before the Sigels received the letter), Illinois law requires that a franchisee be given a reasonable time to cure a default. "Reasonable opportunity" is not defined, although the statute states that it need not exceed 30 days. Ill.Rev.Stat., ch. 121½ ¶ 1719. I find that five days from the date of a letter of default, which might well allow no time from the date of receipt of the letter, is not a reasonable time. This provision of the contract must therefore be superseded by Illinois law. Since the contract did not contain a reasonable time, and I have no evidence upon which to rewrite the contract, I will use the 30 day period permitted by Illinois law in determining whether any

default in this case was cured within a reasonable time after notice.

**4.** They do argue that under the original Franchise Disclosure Statement they received, which gave a 20–day rather than ten-day grace period, more of the payments would not have been late. The Sigels were given a Franchise Disclosure Statement, as required by Illinois law, at the time of their first meeting with officials from Great American. They were later given a revised statement. They received the revised statement months before they signed a contract. While they allege that the Illinois Franchise Disclosure Act was violated by the fact that the contract was different from the initial statement received by them, they do not seek rescission.

listed four invoices as being past due, at the hearing Great American admitted that two were not past due. One of the two invoices that was past due was for $7.19, and was due on June 17, 1990. The remaining one was for $4,254.55., and was apparently due on May 20, 1990.

Great American relies on a fourth notice of default, sent earlier than the ones discussed above, in support of its argument that the Sigels "repeatedly" failed to comply with the lawful provisions of their contract. This notice was sent out in February, 1989, a year earlier than the earliest letter discussed above. The February, 1989 default concerned a mistake in failing to name Great American as an additional insured on the Sigels' insurance. The problem was corrected, but the Sigels did not do anything about the problem until they received the default notice.[5]

Great American apparently did not believe the insurance issue was very serious (or believed, as appears, that it was a mistake of little consequence that was taken care of), because in October, 1989, it sent the Sigels a letter offering them a special price on an additional franchise "[i]n an attempt to recognize your contributions to the system, and as a reward for your loyalty." While the statement and letter is more likely an attempt to sell additional franchises than any personal recognition, it is reasonable to conclude that Great American would not attempt to sell additional franchises to people it believed were in breach of their obligations under existing agreements.

At the hearing on these motions, Great American also submitted evidence and argued that the Sigels engaged in additional events of default in failing to adhere to standards of cleanliness and product quality. Section 18(a) of the contract lists as a material breach the failure of the franchisee to "operate the Cookie System Facility in a good, clean, wholesome manner and in strict compliance with the standards then and from time to time prescribed by Licensor."[6] There can be no doubt that failure to adhere to franchise standards regarding product and cleanliness would be grounds for the termination of a franchise. The difficulty in this case is that Great American never told the Sigels that their operation of their franchise so fell below acceptable standards as to constitute an event of default. The evidence showed that on various occasions inspectors visited the Fox Valley facility, examining it, and grading the facility on both cleanliness and product acceptability. Great American's corporate field supervisor, Brian Hipple, testified that 400 was an average score on these evaluations. (At another point, he testified that 400 was a passing score and that 458 was an average score.[7]) Of seven evaluations introduced in evidence at the hearing on the preliminary injunction, only three, from October, 1989 (368), January, 1990 (376) and February, 1990 (310), had scores below this number. (Great American gave the Fox Valley facility a score of 458 in April, 1990 and 424 in July, 1990. Two others, involving "short" evaluations, were also, according to Mr. Hipple, above average.) Great American argues that ev-

---

**5.** In its post-hearing brief, Great American argues that the Sigels engaged in the same conduct in each of the prior years of the franchise and that there were periods when no insurance was in force. Great American did not make such an allegation previously as a basis for the termination in this case, and the evidence offered (essentially a post-hearing deposition of the Sigels' insurance agent, and exhibits thereto), will accordingly not be considered on this motion.

**6.** The same section required the franchisee to operate the facility "personally on a full-time basis." There is no dispute in the record that before the Sigels entered into the franchise and

at all times thereafter, Great American knew they lived in St. Louis and would be operating the facility primarily through managers, and that Great American did not object to this fact. Indeed, Great American did not raise this part of the provision as a basis for terminating the franchise. However, the Sigels' contrary argument that because they were not personally present much of the time, non-compliance with product or cleanliness (or other) provisions in the contract must be excused is frivolous.

**7.** For a comparison of the conflicts in his testimony in this regard see transcript, May 7, 1991, pages 186, 195, 197, 203.

ery unsatisfactory rating on one of these forms is a separate default event (they may include, and did, a burned out oven light bulb or the failure to have on a name tag). While that argument is simply frivolous, I also conclude that the three evaluations that were below the average (or passing, depending upon which version of Mr. Hipple's testimony is credited) score of 400 cannot be used as events of default because not only were the Sigels never told they were in default as a result of these evaluations, but there was also no evidence that they were even told what number constituted a passing score.

### 3. *Analysis*

■ Surprisingly, there are not many cases discussing the legal standard to be applied in evaluating Great American's evidence of the Sigels' alleged breaches of their contract or the meaning of "good cause" or "repeated" defaults. Both parties have cited cases from other jurisdictions but I find that they are not helpful in determining Illinois law (none discuss the standards under the Illinois Franchise Disclosure Act). Two cases, one in Illinois and the other decided by the Seventh Circuit, are relevant. The first is *Dayan v. McDonald's Corporation*, 81 Ill.Dec. 156, 125 Ill.App.3d 972, 466 N.E.2d 958 (1st Dist. 1984), in which the court held that "good cause" means "failure to substantially comply with obligations under the agreement" and centers on a "determination of commercial reasonability." 81 Ill.Dec. at 171, 466 N.E.2d at 973. (Notably, in that case, the default provisions allowed a 60–day period to cure.) The Seventh Circuit in *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 714 n. 14 (7th Cir.1985) agreed with this interpretation and stated, as an example, that termination for lesser offenses (as opposed to selling non-Mobil gasoline as Mobil gasoline) without an opportunity to cure would

not be "commercially reasonable." *Id.* The court also held that the language of a franchise, drafted by the franchisor, must be "strictly and narrowly construed," and, where possible, should be construed to avoid a forfeiture by one party. *Id.* at 715.[8]

The evidence in this case must be analyzed against the requirements for interpreting both contract language and the language in the Illinois Franchise Disclosure Act permitting termination without regard to cure where a franchisee "repeatedly fails to comply with the lawful provisions of the franchise ... agreement." It is undisputed that at the time of Great American's attempted termination of the Sigels, they were not in default under any provision of the franchise agreement. Great American argues that it is entitled to termination because the Sigels repeatedly failed to comply with the lawful provisions of their agreement.

■ The evidence shows, first, that the Sigels failed to timely report and pay $2,839 in royalties due to a $40,000 error in computing sales in excess of $1,000,000 over a three-year period. I conclude that to be commercially reasonable, the error must be interpreted as one event of default because there is no evidence that the Sigels knew of the mistake until they received the audit report.[9] Furthermore, the contract itself appears to define their failure as one default since Section 18(*o*) lists as a material breach either a failure to comply with Section 11 of the contract or the discovery of underreported sales. There is no dispute that there was only one "discovery." Section 11 requires reports and the keeping and submission of books and records. There has been no contention that the Sigels did not comply with this section. Furthermore, the evidence was inconclusive as to which months underreporting in fact occurred. Accordingly, even if the contract

---

**8.** The court in *Lippo* held that a franchisee was improperly terminated although he intentionally sold misbranded gasoline as that of Mobil Oil. The court distinguished the Second Circuit's decision in *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54 (2d Cir.1984), on the ground that the evidence there showed that the operator had been

continuously buying and selling misbranded gasoline for a period of six months or more.

**9.** On this record, there is also no evidence that they knew their accountant had material information that he had failed to provide them.

could be interpreted to permit Great American's interpretation,[10] on this record I would find only one default event. In evaluating the significance to be given this default event, it must also be kept in mind that the report indicated only one small error in the entire year preceding the year in which the audit occurred.

The evidence also shows that during a six-month period in 1990, the Sigels were late in paying (ignoring amounts under $100 as being inconsequential) four invoices. The invoices in question were overdue by 19, 35, 33 and 38 days. They resulted in two notices of default, and technically involved four events of default as defined by the contract. The Sigels explained the problem as arising from a manager who is no longer at the facility.

Under the contract, failure to pay any invoice within ten days of its due date constitutes an event of default. Accordingly, Great American argues, since each of these overdue invoices was more than ten days late, the number of events of default (five, counting the royalty underpayments) exceeded that allowed by the contract in one year (two) and, together with the previous mistake in failing to name Great American as an insured, constitute repeated failures to abide by the lawful contract provisions permitting termination under both the contract and the Illinois Franchise Disclosure Act.

Lawful contract provisions, under Illinois law, must be commercially reasonable. *Lippo v. Mobil Oil Co., supra; Dayan v. McDonald's Corp., supra.* In this case, none of the invoices in question was even

40 days overdue at the time it was paid. While neither party put on specific evidence of what may be commercially reasonable in terms of business practices in paying debts, I think it is unlikely that any court construing Illinois law would find that a contract provision allowing a business to declare a default (potentially resulting in forfeiture of the entire business) for failure to pay an invoice within ten days is commercially reasonable.[11] If the provision is not commercially reasonable, failure to comply with the provision cannot constitute good cause for termination under the contract.

Since, with the exception of the event of default based on discovery of underpayments in royalties, and the much earlier mistake in failing to name Great American as an additional insured, the bases argued by Great American to constitute good cause for termination in this case have not been shown to be commercially reasonable or are otherwise defective as discussed in this opinion, I conclude that Great American is unlikely to prevail on the merits of this issue. Conversely, I believe the Sigels are likely to prevail on the merits of their claim that Great American attempted to terminate their franchise without good cause.

In addition to the likelihood of success, a court considering a motion for a preliminary injunction must weigh the threatened harm to each of the parties. In the present case, if Great American's motion is granted, the Sigels' business will be terminated, and according to Mr. Sigel, they may suffer additional consequences resulting from notes securing the Sigels'

10. Keeping in mind the Seventh Circuit's admonition in *Lippo v. Mobil Oil Corp., supra,* 776 F.2d at 715, that language in a franchise agreement should be interpreted narrowly, against the drafter, and to avoid a forfeiture where possible, I do not think the agreement can be so interpreted.

11. Obviously, a business cannot avoid paying its debts and expect to continue in business for very long and a reasonable contract provision allowing a franchisor to declare a default for failure to pay amounts owed the franchisor would surely be acceptable under Illinois law.

Great American's draconian provision, however, is not even arguably reasonable.

I am aware that a recent Indiana appellate decision, *Hacienda Mexican Restaurant v. Hacienda Franchise Corp.,* 569 N.E.2d 661 (Ind. App.1991), upheld a preliminary injunction permitting termination of a franchisee for three late royalty payments after concluding that "good cause" under Indiana law, could include nonmaterial breaches of contract. Illinois law, as interpreted by the court in *Dayan v. McDonald's Corporation, supra,* 81 Ill.Dec. at 171, 466 N.E.2d at 973, limits "good cause" to material breaches of the franchise agreement.

$291,000 capital investment in the business. Great American argues that it, and the public, are being harmed by the Sigels' sale of product not made by Great American. However, there is no evidence that the Sigels desire to sell any other product, and if a preliminary injunction is issued requiring Great American to comply with the terms of its agreement with the Sigels, including supplying them with batter and other supplies, there is no reason to believe that Great American or the public will suffer any harm pending the final outcome of this suit.[12] In addition, the public policy of Illinois, as embodied in its Franchise Act, is to prohibit franchisors from terminating franchisees without good cause. *See, e.g., Al Bishop Agency, Inc. v. Lithonia, Inc.,* 474 F.Supp. 828, 835 (E.D.Wis.1979) (the legislature having determined that the public interest is served in allowing dealer terminations only for good cause, a preliminary injunction was appropriate).

I conclude that the threatened injury to the Sigels far outweighs the threatened injury to Great American on this record. I also conclude that if a preliminary injunction is entered requiring Great American to supply cookie batter, there is no evidence that the public will be harmed by any trademark violation. Accordingly, since I also conclude that the Sigels are likely to prevail on the merits of this action with regard to improper termination of their franchise, I recommend that the Sigels' motion for a preliminary injunction be granted and Great American's motion be denied. Dated: July 25, 1991.

---

**12.** Great American introduced evidence at the hearing that some cookies recently sold by the Sigels did not adhere to product specifications in terms of size or design. It also submitted an affidavit following the hearing indicating that a payment had not been made. My understanding is that payments are being made to an escrow account in the court. I have not considered the other evidence regarding cookies made while this suit is pending because the Sigels have not, so far as the record shows, been informed that corrective action had to be taken (Great American's position has been that the Sigels are no longer franchisees). If an injunction is issued, the Sigels will be required to comply with the requirements of the franchise, including product acceptability, and will immediately have to make any payments withheld during the pendency of this motion.